[Cite as *State v. Pellegrini*, 2013-Ohio-141.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO.  1-12-30

    v.

GIOVANNI L. PELLEGRINI,          O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2012 0008

**Judgment Affirmed**

**Date of Decision:   January 22, 2013**

APPEARANCES:

    *Kenneth J. Rexford*  for Appellant

    *Jana E. Emerick*  for Appellee

**PRESTON, P.J.**

{¶1} Defendant-appellant, Giovanni L. Pellegrini, appeals the Allen County Court of Common Pleas' judgment entry of conviction and sentence. We affirm.

{¶2} This case stems from the theft of a moneybag from a Rays Signature Foods' employee, Mary Ann Norris, as she was walking the money to the bank for deposit. Pellegrini, an employee at Rays, provided inside information enabling his friend and co-defendant, Mike Pasterchik, to snatch the moneybag and drive off with co-defendant, Adam Reid. (May 8-9 2012 Tr. at 51-58, 87-88, 96-97, 101, 116-117). When Pasterchik ripped the moneybag from Norris' hands, it caught a ring on her pinky finger, causing her to violently spin around and her finger to swell for several days after the incident. (*Id*. at 52, 58). Pellegrini was not present or working the day of the incident. (*Id*. at 43).

{¶3} On February 16, 2012, the Allen County Grand Jury indicted Pellegrini on Count One of robbery in violation of R.C. 2911.02(A), a second degree felony, and Count Two of grand theft in violation of R.C. 2913.02(A)(1), (B)(2), a fourth degree felony. (Doc. No. 7). Although the indictment charged Pellegrini of the principal offenses as permitted under R.C. 2923.03(F), a subsequently filed bill of particulars clarified that Pellegrini was being charged under the complicity statute for his involvement in the criminal activity. (Doc. No. 51).

{¶4} On February 22, 2012, Pellegrini filed a written plea of not guilty to both counts. (Doc. No. 11).

{¶5} On May 8-9, 2012, the matter proceeded to jury trial, and the jury found Pellegrini guilty on both counts. (Doc. Nos. 60-62).

{¶6} On June 14, 2012, the trial court held a sentencing hearing. (Doc. No. 67). After the trial court concluded that Count Two was an allied offense with Count One under *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, the State elected to proceed on Count One of robbery. (*Id*.). The trial court then sentenced Pellegrini to three years imprisonment. (*Id*.).

{¶7} On July 5, 2012, Pellegrini filed a notice of appeal. (Doc. No. 71). Pellegrini now raises four assignments of error for our review. We elect to combine his first, second, and fourth assignments of error for analysis.

### Assignment of Error No. I

**The conviction for Robbery pursuant to R.C. §2911.02(A)(2) was not supported by sufficient evidence as to the element of "physical harm" and the *mens rea* element attached thereto.**

### Assignment of Error No. II

**The conviction for Robbery pursuant to R.C. §2911.02(A)(2) was against the manifest weight of evidence as to the element of "physical harm" and as to the *mens rea* element attached thereto.**

**Assignment of Error No. IV**

**The conviction for Grand Theft was against the manifest weight
of the evidence and not supported by sufficient evidence.**

{¶8} In his first and second assignments of error, Pellegrini argues that his robbery conviction was not supported by sufficient evidence and against the manifest weight of the evidence, because the State failed to prove that he *recklessly* inflicted physical harm upon another during the commission of the offense. Particularly, Pellegrini argues that he was not "reckless" with respect to the physical harm caused to Norris since the injury "was completely unanticipated, as the intent was a simple grab-and-run with an expectation of grabbing the money bag without any injury intended or expected." (Appellant's Brief at 7). Moreover, Pellegrini argues that R.C. 2911.02(A)(2) requires that he "inflict" physical harm, not merely "cause" physical harm. Pellegrini argues that the legislature's use of the term "inflict" rather than "cause" requires direct action upon the victim, and the direct action here was upon the moneybag, which "accidentally and incidentally caus[ed] the injury by catching on the ring on the finger." (*Id*. at 10).

{¶9} In his fourth assignment of error, Pellegrini argues that his grand theft conviction was against the manifest weight of the evidence and not supported by sufficient evidence since the State failed to prove that he acted with "purpose to deprive the owner of property or services" as required under R.C. 2913.02. In particular, Pellegrini argues that he declined to participate in the theft and did not

expect any "financial reimbursement" for his assistance. Pellegrini argues that he merely answered his friend's questions and provided what was useful information. Pellegrini argues that his actions may have been "dumb" but not criminal.

{¶10} When reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus.

{¶11} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶12} The criminal offense of robbery is codified in R.C. 2911.02, which provides, in relevant part: "[n]o person, in attempting or committing a theft

offense or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, attempt to inflict, or threaten to inflict physical harm on another." R.C. 2911.02(A)(2). "'Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶13} The requisite mental culpability for the criminal offense of robbery charged under R.C. 2911.02(A)(2) is recklessness. *State v. Colon*, 118 Ohio St.3d 26, 2008-Ohio-1624, ¶ 14; *State v. Hurst*, 181 Ohio App.3d 454, 2009-Ohio-983, ¶ 20 (5th Dist.). R.C. 2901.22(C) defines "recklessly" as follows:

> A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.

{¶14} The criminal offense of theft is codified in R.C. 2913.02, which provides, in relevant part: "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [w]ithout the consent of the owner or person authorized to give consent." R.C. 2913.02(A)(1). If the value of the property stolen exceeds

$7,500.00 but is less than $150,000.00, a violation of R.C. 2913.02 is grand theft, a fourth degree felony. R.C. 2913.02(B)(2).

{¶15} The complicity statute provides, in pertinent part: "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." R.C. 2923.03(A)(2)

{¶16} Trina Yvette Cannon, a customer service representative and assistant manager at Rays Signature Foods in Lima, Ohio, testified that, in December 2011, she was responsible for scheduling employees. (May 8-9, 2012 Tr. at 26-27). Cannon testified that, as of December 23, 2011, Pellegrini, who she knew as "Johnny," had been employed as a bagger at Rays for three and one-half years. (*Id.* at 27-28). Cannon identified State's exhibit one as Pellegrini's time card statement for the week of December 19-25, 2011. (*Id.* at 30). Cannon testified that Pellegrini was scheduled to work every day that week, except Tuesday, since it was a holiday week, and Rays scheduled all of its employees to work all week on holiday weeks. (*Id.* at 33). Cannon testified, however, that Pellegrini did not work his scheduled shifts on Thursday, December 22, 2011, or Friday, December 23, 2011. (*Id.* at 33-34). Cannon testified that the week prior to Christmas is usually very busy so Rays does not normally like to honor requests for time off during that week. (*Id.*). Pellegrini insisted that he have Thursday and Friday off

to work a construction job in Columbus with his uncle, testified Cannon. (*Id*. at 35-36).

**{¶17}** Cannon testified that Rays generally deposits $10,000.00 in cash per day, along with any checks it receives. (*Id*. at 36). Cannon testified that, prior to its bank deposit, Rays enters the deposit amounts into an in-house computer system. (*Id*.). Cannon identified State's exhibit two as the deposit summary for the week of December 19-25, 2011. (*Id*. at 37). Cannon testified that, for December 23, 2011, there were three entries on the deposit summary, including: $7,762.62 in checks; $10,000.00; and, $5,000.00. (*Id*. at 38). She further testified that the initials "M.A.N." appearing next to the December 23, 2011 deposit entries stood for Mary Ann Norris, the Rays' employee who prepared the deposit that day. (*Id*. at 38-39). Cannon testified that Norris did not make the scheduled deposit that day; but instead, the money was "snatched" as Norris and another employee were walking it to the bank. (*Id*. at 40). Cannon testified that neither Mike Pasterchik, nor Adam Reid, nor Pellegrini had permission to take the money. (*Id*.). Cannon testified that neither Pasterchik nor Reid ever worked at Rays. (*Id*.). On cross-examination, Cannon testified that the deposits were taken to the bank between, either 11:00 a.m. to 1:00 p.m. or between 12:00 p.m. and 2:00 p.m., though the exact time varies from day to day. (*Id*. at 43-44). Cannon testified that

other Rays' employees working that day could have seen the money being taken to the bank, and that Pellegrini was not working on December 23, 2011. (*Id*. at 43).

{¶18} Mary Ann Norris testified that she has worked for Rays since 1990, and the Shawnee Rays for the past three and a half years. (*Id*. at 45). Norris testified that she is currently the office manager. (*Id*. at 46). Norris testified that she is familiar with Pellegrini and identified him in court. (*Id*.). She testified that, as part of her job responsibilities, she prepares and delivers bank deposits to the Huntington Bank, which is located right around the corner from Rays. (*Id*. at 47); (State's Ex. 3). Norris testified that, beginning on September 8, 2011 until the robbery on December 23, 2011, she was taking the Rays' deposits to the bank every day. (May 8-9, 2012 Tr. at 49). Norris testified that, for security purposes, she usually asked one of the carry-out employees to accompany her, and that Pellegrini accompanied her to the bank 20 to 30 times. (*Id*. at 49-50). Norris testified that, on the day of the incident, she and the scanning coordinator walked out the front door of the store and were half-way into the drive of the bank when a man came up behind her, grabbed the money bag, and took off. (*Id*. at 51). Norris testified that she had the money bag wrapped around her little finger, and when the man snatched the money bag, it caught a ring on her pinky finger causing the ring to dig into her finger and her finger to swell. (*Id*. at 52). Norris testified that her finger was red and swollen for three to four days after the incident, though she did

not seek medical attention. (*Id*.); (*Id*. at 58). Norris testified that the man pulled the money bag so hard it jerked her and spun her around. (*Id*. at 57). Norris was upset, called the man a "Son of a bitch," and watched him get into a car that was driving out of the parking lot and turning North onto Cable Road. (*Id*. at 57-58).

{¶19} Norris identified State's exhibit four as the Rays' moneybag, which Huntington Bank provided and was marked "Rays 106." (*Id*. at 52-53). She identified State's exhibit five as the reusable, cloth Rays' grocery bag she used to conceal the bank moneybag when she made deposits. (*Id*. at 53-55). Norris testified that she had the strap of the grocery bag wrapped around her pinky finger the day of the robbery. (*Id*. at 54). Norris identified State's exhibit six as a copy of one of the bank deposit slips that was rubber-banded to the money in the money bag the day of the robbery. (*Id*. at 54-55). Norris testified that there were two other deposit slips in the moneybag that day as well, one for five thousand in cash and another for a little over seven thousand in checks. (*Id*. at 56). Norris identified State's exhibit seven as the bill straps for the money, which had her initials, M.A.N., on them, and were placed around the cash inside the moneybag. (*Id*. at 56-57). Norris testified that neither Pasterchik, nor Reid, nor Pellegrini had permission to take the money. (*Id*. at 58). On cross-examination, Norris testified that Pellegrini worked at Rays for around three and a half years, and she did not know of Pellegrini stealing anything from Rays during that time. (*Id*. at 59-60).

{¶20} Kristie Mae Bolyard testified that she has been employed at Kay's Jewelers since May 1999, and she has been the manager at the Lima Mall Kay's for the past five years. (*Id*. at 62-63). Bolyard testified that she was working at the store on December 23, 2011, and she identified State's exhibit eight as a sales receipt from a transaction she conducted at 7:04 p.m. that day with a customer named Michael Pasterchik. (*Id*. at 64-65). Bolyard testified that Pasterchik purchased a diamond engagement fashion ring and an extended service plan for a total of $61.69. (*Id*. at 66). Bolyard identified State's exhibit nine as a copy of a sales transaction she conducted at 8:21 p.m. that same day with a different customer, Pellegrini, who purchased a diamond fashion ring for $59.99 and a lifetime warranty for $19.99 and paid in cash. (*Id*. at 67-69). Bolyard testified that she remembered this transaction since she pushed the customer into purchasing the warranty since she made more money on the warranty. (*Id*. at 68-69). Bolyard testified that she did not recognize Pellegrini but did recall the transaction since Pasterchik brought Pellegrini back to purchase the ring, and Pasterchik told Pellegrini that he needed the warranty. (*Id*. at 69-70). On cross-examination, Bolyard testified that, when Pellegrini stated he did not have the money for the warranty, Pasterchik stated, "You have to get it. I got it on mine. You need to get it. Here[]," and Pasterchik paid for the warranty. (*Id*. at 70, 72). Bolyard could not recall who handed her the money for the warranty, though she

testified that all of the money, $85.18, was given to her in cash at one time. (*Id*. at 72).

**{¶21}** Lima Police Detective Steven Stechschulte testified that, on December 23, 2011 around 1:00 p.m., he was called to the Rays Supermarket to investigate a robbery. (*Id*. at 73-74). Stechschulte testified that Detective Marik was the initial responder, so he conducted the initial interviews, but Detective Marik has since retired. (*Id*. at 74). Stechschulte testified that Marik informed him that two employees were walking the deposit to the bank when someone drove up next to them and one person got out of the car and grabbed the money bag out of the employee's hand and jumped back into the car and drove away eastbound. (*Id*. at 74-75). Detective Marik also informed him that a witness saw it happen and obtained a license plate number. (*Id*. at 75). Stechschulte testified that the vehicle was registered to Jeremiah Meritt at 903 Rice. (*Id*. at 77). He testified that he arrived at the scene and no one was home, so he talked with the neighbor to get information about the landlord. (*Id*.). According to Stechschulte, the neighbor told him that morning she saw a green Pontiac, later identified as a 1992 Pontiac Bonneville which was normally parked at the residence, leave with three white males inside. (*Id*. at 78-79). The landlord confirmed that Meritt lived at the residence along with Jim Cotter, and that they both worked at Kerns Fireplace on Elida Road. (*Id*. at 78). Stechschulte testified that he talked with

Cotter over the phone and inquired about the green car registered to his roommate, and Cotter became very evasive on the phone. (*Id*. at 79). Stechschulte testified that, after this conversation, he began to think of Meritt as his suspect, so he decided to go to Kerns Fireplace immediately before Cotter could warn Meritt that he was looking for him. (*Id*.). Stechschulte testified that, after talking with Meritt and Cotter, he determined that Cotter's step-son, Adam Reid, was the one in charge of the car and most likely responsible for the robbery. (*Id*. at 80). Stechsculte testified that he learned that Cotter's son, Cole, worked at ABC Warehouse just down the street, so he went there to talk with Cole. (*Id*.). Stechschulte talked with the manager at ABC Warehouse and verified that Cole had been at work all day. (*Id*. at 80-81). Stechschulte asked Cole if he had a brother, and Cole indicated that Adam Reid was his half-brother and he had been in prison for a robbery before. (*Id*. at 81). Cole also indicated that Reid normally drives the car and stated that he could see Reid robbing the supermarket. (*Id*.). Cole told Stechschulte that Reid normally hangs out with Pasterchik, who had been staying with Cole. (*Id*.). Stechschulte testified that he subsequently located Pasterchik at Cole's house. (*Id*. at 82).

{¶22} Stechschulte testified that, after he left Kerns Fireplace, he called Adam Reid on the phone, and Reid claimed he was doing construction on a house in Dayton, which Stechschulte did not believe since he could hear a T.V. in the

background of the phone conversation. (*Id*.). Stechsculte testified that he executed a search warrant at Reid's residence, 463 West McKibben. (*Id*. at 83). Stechschulte identified: State's exhibit ten as a photograph of the garbage bag found on the front living room floor of 463 McKibben; State's exhibit eleven as a photograph of the Huntington Bank money bag with "Rays" written on it which they found inside the garbage bag; and State's exhibit twelve as a photograph of the personal checks payable to Rays found inside the bank bag. (*Id*. at 84). Stechschulte identified: State's exhibit four as the Huntington money bag; State's exhibit five as the Rays grocery bag which they subsequently located along the route the suspects traveled; State's exhibit seven as money bands, some of which were located inside the money bag recovered from the bank bag and some of which were located inside Pasterchik's safe; State's exhibits thirteen and fourteen as photographs of money located in Pasterchik's safe; and, State's exhibit eight as a Kay's Jewelry receipt located inside Pasterchik's safe. (*Id*. at 84-87).

{¶23} Stechsculte testified that he interviewed Pasterchik and Reid, who both eventually admitted to their involvement in the robbery. (*Id*. at 87-88). Stechschulte learned during his interviews that Pellegrini was also involved in the robbery. (*Id*. at 88). Stechsculte identified State's exhibit fifteen as a copy of portions of the interview with Pellegrini, which interview was subsequently played for the jury. (*Id*. at 89-92). Stechsculte testified that there was no video available

from the robbery or from the Kay's Jewelry store. (*Id*. at 92). He also testified that he was unable to obtain any text messages from the cell phone company since text messages are only kept for five days, and he was unable to obtain the text messages from the suspects since they were not on their current cell phones. (*Id*.).

{¶24} On cross-examination, Stechsculte testified that, in June or July of 2011, Pellegrini had a conversation with Pasterchik about the lack of security at Rays. (*Id*. at 96). The text message that Pellegrini sent to Pasterchik showing the Rays' employees taking a deposit to the bank was sent around late November or early December 2011. (*Id*. at 97). Stechsculte testified that they did not locate Pellegrini's fingerprints on the vehicle or any evidence that would implicate Pellegrini at Reid's residence or in Pasterchik's safe. (*Id*. at 98). Stechschulte testified that he did not find any physical evidence implicating Pellegrini. (*Id*. at 100). Pellegrini did not have any relevant, prior convictions according to Stechschulte. (*Id*. at 100-101). Stechschulte testified that Reid indicated during his interview that Pasterchik knew someone on the inside, though Reid had never met Pellegrini before. (*Id*. at 101). Stechschulte testified that the only money Pellegrini received from the robbery was the $19.99 for the ring warranty, and that Pellegrini stated during his interview that Pasterchik owed him $40.00. (*Id*. at 102).

{¶25} Thereafter, the State rested, and the defense made a Crim.R. 29(A) motion for acquittal, which was denied. (*Id*. at 104, 107-109).

{¶26} The defense called Adam Reid to the stand, who testified that he pled guilty to the robbery, which occurred at the Rays Supermarket on December 23, 2011, and that he has never personally met Pellegrini. (*Id*. at 111-112). On cross-examination, the State asked Reid what he meant by never meeting Pellegrini personally, and Reid testified that his brother bought some pills from Pellegrini and he was in the car with his brother at the time. (*Id*. at 113). Reid further testified that his brother purchased the pills from Pellegrini in the Rays parking lot. (*Id*.). Reid testified that he has done this sort of thing in the past and has a criminal record. (*Id*. at 114). According to Reid, Pasterchik told him about the Rays Supermarket 'job,' though Reid was reluctant to participate at first. (*Id*.). Reid testified that he saw a picture of two Rays employees walking across the Rays parking lot on Pasterchik's cell phone about three days prior to committing the robbery and once before, about four weeks prior to the robbery. (*Id*. at 116). Reid testified that he knew who sent the pictures and had reason to believe it was Pellegrini, and the information that Pasterchik provided him was important to completing the robbery. (*Id*. at 117). On re-direct, Reid testified that he was not sure how old the picture on Pasterchik's phone was or whether or not Pasterchik had saved the photo from before. (*Id*. at 118). Reid testified that Pasterchik

showed him the same picture twice on the phone, and he never talked with Pellegrini. (*Id*.).

{¶27} The defense also called Detective Stechsculte, who testified that he had never retrieved the text message with the picture that was supposedly sent to Pasterchik. (*Id*. at 124). Stechsculte testified that Pellegrini indicated during the interview that the cell phone in his possession was not the same one he had when the text message was supposedly sent. (*Id*.); (*Id*. at 126). Stechschulte further testified that Pellegrini indicated that he got rid of the cell phone from which he sent the picture. (*Id*. at 126). Stechschulte also testified that it was his impression from the interviews with Reid and Pasterchik that they were trying to minimize Pellegrini's role in the robbery to protect him. (*Id*. at 128). He also testified that he did not believe Reid and Pasterchik were forthcoming about the amount of money Pellegrini received from the robbery. (*Id*. at 128, 131).

{¶28} Thereafter, the defense rested, and the jury found Pellegrini guilty on both counts. (*Id*. at 133, 190-191).

{¶29} Pellegrini argues that the evidence failed to show that he "inflict[ed]" physical harm upon the victim as that term is used in the robbery statute. Pellegrini cites to *State v. Bates*, 10th Dist. No. 97APA02-171 (Dec. 2, 1997) in support of his argument that he did not "inflict" physical harm. The victim in *Bates* severely lacerated his forearm when he punched the defendant, a would-be

robber, as the defendant was entering his home through a broken window. *Id.* at *1. On appeal, the defendant argued that he did not "inflict" physical harm upon the victim; but rather, the victim suffered physical harm as a result of punching him through the window. *Id.* at *4. Since the term "inflict" was not defined in the statute, the Appellate Court analyzed the common definitions of the term "inflict" and determined that "[e]ach of these definitions suggests that inflict connotes more than simple 'but for' causation, but implies some direct action by one person upon another." *Id.* The Appellate Court also noted that the legislature had used the term "caused" to modify the term "serious physical harm" in the felonious assault statute, R.C. 2903.11(A); and therefore, the legislature must not have intended the terms "inflict" and "caused" to be synonymous, as the State urged on appeal. *Id.* After reviewing the evidence, the Court in *Bates* concluded that "the serious physical harm suffered by [the victim] was caused indirectly by defendant breaking the window and then attempting to enter the victim's apartment through the broken window, rather than by any direct action of defendant upon [the victim]." *Id.* at *5. Since the injury to the victim was not caused by the defendant's direct action upon the victim, the Court in *Bates* found the evidence insufficient to support an aggravated robbery conviction. *Id.*

{¶30} The facts of this case are clearly distinguishable from *Bates*. Norris, the victim herein, did not suffer the physical injury by attacking the criminal, like

the victim in *Bates*; rather, Norris suffered her physical injury as a direct result of Pasterchik grabbing and yanking the money bag from her hands—a direct action by Pasterchik upon Norris. Consequently, we reject Pellegrini's argument that he, by virtue of his co-defendant's actions, did not "inflict" physical harm upon the victim in this case.

{¶31} Next, Pellegrini argues that the evidence failed to demonstrate that he recklessly caused the victim physical harm since the injury was completely unforeseeable as the intent was a simple grab-and-run theft. We disagree. The evidence in this case demonstrated that Pellegrini provided Pasterchik with inside information concerning Rays' depositing procedures. Pellegrini knew that Pasterchik was planning on taking the money from the Rays employees, and he knew that such an incident would likely result in a confrontation leading to physical harm of one or both of the employees. Pellegrini argues that the particular type of injury Norris suffered was "[o]nly because of a freak catch on a ring"; and therefore, he could not have appreciated the risk of this particular injury. It was not necessary that Pellegrini anticipate the exact nature and extent of Norris' injury; it was only necessary that he anticipated that Norris would likely be injured under the circumstances. To hold otherwise defies common sense and strains the statutory language. Furthermore, the injury Norris sustained is similar

to the kinds of injuries sustained by victims of a grab-and-run robbery—a strained and bruised finger. *See State v. Taylor*, 2d Dist. No. 22564, 2009-Ohio-806, ¶ 20.

**{¶32}** Upon review of the evidence presented, we cannot conclude that the State presented insufficient evidence to sustain Pellegrini's robbery conviction or that his robbery conviction was against the manifest weight of the evidence.

**{¶33}** In his fourth assignment of error, Pellegrini argues that his grand theft conviction was against the manifest weight of the evidence because the State failed to prove that he acted with purpose to deprive Rays of the property. Pellegrini argues that he rejected an offer to join in the theft and did not expect any financial reimbursement. These arguments lack merit.

**{¶34}** R.C. 2901.22(A) defines "purposely" as follows:

A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.

**{¶35}** Direct evidence is not essential to prove an element of an offense, and circumstantial evidence is equally probative, especially as to a mental state in which the sole direct evidence is known only to the accused. *Jenks*, 61 Ohio St.3d 259, 272. Moreover, since a defendant's mental state is difficult to demonstrate

with direct proof, it may be "inferred from the circumstances." *State v. Logan*, 60 Ohio St.2d 126, 131 (1979); *State v. Clark*, 101 Ohio App.3d 389, 405 (8th Dist.1995).

{¶36} To begin with, we note that Pellegrini did not assert the affirmative defense of renunciation at trial. R.C. 2923.03(E). Although the evidence failed to demonstrate that Pellegrini *expected* any "financial reimbursement" for the information he provided to Pasterchik, Pellegrini did, in fact, receive proceeds from the theft. Pasterchik paid Pellegrini money he had supposedly borrowed from him and paid for an insurance policy for Pellegrini with proceeds from the theft. Furthermore, Detective Stechschulte testified that Reid and Pasterchik were trying to minimize Pellegrini's role in the robbery to protect him; and consequently, they were not forthcoming about the amount of money Pellegrini received from the robbery. (May 8-9, 2012 Tr. at 128, 131). Aside from that, the jury could have concluded that Pellegrini intended to deprive Rays of the money regardless of whether or not he expected any financial gain given his conduct. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 127. Pellegrini volunteered information to Pasterchik instigating and effectuating the crime, and continued to do so even after he was aware that Pasterchik was actually going to complete the crime. Although Pellegrini did not want to be involved in actually taking the money from the Rays employees, he provided information that Reid

-21-

testified was essential to completing the robbery. (May 8-9, 2012 Tr. at 117). Given the circumstances of this case, we cannot conclude that the jury lost its way in convicting Pellegrini of grand theft.

{¶37} Pellegrini's first, second, and fourth assignments of error are overruled.

### Assignment of Error No. III

### Mr. Pellegrini was deprived of effective assistance of counsel.

{¶38} In his third assignment of error, Pellegrini argues that he was denied effective assistance of counsel because trial counsel: (1) allowed and perpetuated testimony of his prior bad acts, namely illegally selling prescription drugs; (2) bolstered the State's case by calling Adam Reid to the stand; (3) emphasized his prior bad acts and Reid's testimony in closing argument; (4) failed to call him as a witness in light of Reid's testimony; and, (5) allowed the jury to hear his refusal to consent to a search of his cell phone during the police interview.

{¶39} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984).

**{¶40}** In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland*, 466 U.S. at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St. 3d 136, 141-142 (1989), citing *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976).

**{¶41}** Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bradley*, 42 Ohio St.3d at 142, citing *Strickland*, 466 U.S. at 691. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bradley*, 42 Ohio St.3d at 142; *Strickland*, 466 U.S. at 694.

**{¶42}** Pellegrini first argues that trial counsel was ineffective for failing to file a motion in limine to redact from his police interview his statement that Pasterchik owed him $40.00 for sharing drugs with him. We disagree.

-23-

{¶43} As an initial matter, the filing of a motion in limine is generally a matter of trial strategy. *State v. Swiergosz*, 197 Ohio App.3d 40, 2012-Ohio-830, ¶ 22 (6th Dist.). Furthermore, Evid.R. 404(B), only excludes "[e]vidence of other crimes, wrongs, or acts * * * [admitted] to prove the character of a person in order to show action in conformity therewith." The evidence may be admissible for other purposes, however, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id*. The State did not offer evidence of Pellegrini's drug use with Pasterchik at trial to show conformity therewith in the present case; but rather, to show the relationship between the two men and Pellegrini's possible motive. (*See* May 8-9, 2012 Tr. at 18, 147-150). Since the evidence was not clearly barred under Evid.R. 404(B), trial counsel was not ineffective for failing to file the motion in limine as Pellegrini argues.

{¶44} Next, Pellegrini argues that trial counsel was ineffective for calling Reid to testify that he admitted to the robbery and he did not know Pellegrini, facts already in evidence, and, thereby, opening the door to further testimony concerning Pellegrini's sale of illegal drugs.

{¶45} "'Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court.'"

*State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 217, quoting *State v. Treesh*, 90 Ohio St.3d 460, 490 (2001).

**{¶46}** When asked during his direct testimony whether he had ever met Pellegrini, Reid testified "[n]ot personally." (May 8-9, 2012 Tr. at 112). On cross-examination, the State asked Reid what he meant by "not personally," and Reid testified that his brother bought some pills from Pellegrini in the Rays parking lot. (*Id.* at 113). Trial counsel was not ineffective for calling Reid to testify. While trial counsel's strategy may have been ill-advised in hindsight, nothing in the record suggests that counsel was aware, or should have been aware, that Pellegrini sold Reid's brother drugs prior to calling Reid as a witness. Aside from that, the jury was already aware of Pellegrini's illegal drug activity from viewing the police interview, and we are not persuaded that he suffered prejudice from this testimony.

**{¶47}** Pellegrini further argues that trial counsel was ineffective for reemphasizing his illegal drug activity during closing arguments. We again disagree. "[T]he manner and content of trial counsel's closing arguments are a matter of trial strategy and do not constitute ineffective assistance of counsel." *State v. Turks*, 3d Dist. No. 1-08-44, 2009-Ohio-1837, ¶ 42, citing *State v. Williams*, 3d Dist. No. 9-07-61, 2008-Ohio-3887, ¶ 70. After Reid's testimony turned out different than trial counsel expected, counsel attempted to explain the

purpose of Reid's testimony and to reemphasize that the State bore the ultimate burden of proof at trial, not the defense. (May 8-9, 2012 Tr. at 135-137). Trial counsel also suggested that Reid's testimony was a "trap" set up by the State from which he could not have escaped. (*Id*. at 157). While this trial strategy did not ultimately prevail, we cannot conclude that it amounted to ineffective assistance. Trial counsel also asked the jury to view the police interview during their deliberations since Pellegrini repeatedly denied his involvement in the robbery, despite law enforcement's allegedly coercive tactics. (*Id*. at 158-159). Again, while this strategy did not ultimately persuade the jury, it was not unreasonable to take this approach, and we will not second-guess this trial strategy on appeal.

**{¶48}** Next, Pellegrini argues that trial counsel was ineffective for failing to have him testify and for opening the door on the issue of his illegal drug activity. We disagree. Initially, we note that there is no indication in the record that Pellegrini ever requested to be a witness; consequently, we must presume that trial counsel made a tactical decision to keep him off the witness stand. *State v. McClellan*, 3d Dist. No. 1-09-21, 2010-Ohio-314, ¶ 61, citing *State v. Solomon*, 3d Dist. No. 9-03-58, 2004-Ohio-2795, ¶ 23. Furthermore, "'[c]ourts are reluctant to find on direct appeal that an attorney has been ineffective for failing to call a witness, because it is difficult to show on direct appeal that a witness's testimony could have changed the outcome of the trial.'" *Solomon* at ¶ 23, quoting *State v.*

*Hector*, 2d Dist. No. 18653 (Mar. 8, 2002). As Pellegrini has already noted, trial counsel had reasons not to call him as a witness; to wit: his prior drug activity. Additionally, after viewing the police interview, counsel may have reasonably concluded that Pellegrini was not a credible, favorable witness. Therefore, trial counsel was not ineffective for failing to call Pellegrini to testify.

{¶49} Finally, Pellegrini argues that trial counsel was ineffective for allowing the jury to hear evidence concerning his refusal to consent to the search of his cell phone. Defendants cannot be penalized for exercising their constitutional rights; nevertheless, we are not persuaded that trial counsel's failure to redact this evidence from the police interview (State's Ex. 15) amounted to ineffective assistance. *See Doyle v. Ohio*, 426 U.S. 610, 618-619, 96 S.Ct. 2240 (1976) (right to remain silent under *Miranda*); *State v. O'Dell*, 45 Ohio St.3d 140, 147 (1989) (right to trial); *State v. Landrum*, 53 Ohio St.3d 107, 110 (1990).

{¶50} During the police interview, law enforcement asked Pellegrini if the cell phone in his possession was the same cell phone he used to send Pasterchik the text message. (State's Ex. 15); (May 8-9, 2012 Tr. at 124-126). Pellegrini stated that it was *not* the same cell phone, and when law enforcement then asked for his consent to search it, he refused. (*Id.*); (*Id.*). This exchange lasted, at most, 30 seconds, while the interview lasted approximately 30 minutes. (State's Ex. 15). The State did not present any other evidence of Pellegrini's refusal to consent to

the search of his cell phone. Considering the very limited and isolated reference to Pellegrini's refusal to consent to the search, we are not persuaded that Pellegrini suffered prejudice sufficient to undermine the outcome of the proceedings. Furthermore, rather than exclude such evidence from the trial, defense counsel, as a matter of trial strategy, questioned Detective Stechschulte about law enforcement's failure to search Pellegrini's cell phone to show the allegedly inadequate nature of the police investigation in this case. (May 8-9, 2012 Tr. at 124-125). Consequently, we cannot conclude that trial counsel was ineffective for not redacting the evidence and instead using it as a matter of trial strategy.

{¶51} Pellegrini's fourth assignment of error is, therefore, overruled.

{¶52} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and SHAW, J.J., concur.**

**/jlr**