[Cite as *State v. Bruce*, 2023-Ohio-3298.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

     v.

TIMOTHY ALLEN BRUCE,

    DEFENDANT-APPELLANT.

CASE NO. 14-22-11

O P I N I O N

Appeal from Union County Common Pleas Court
Trial Court No. 19-CR-0239

**Judgment Reversed**

**Date of Decision: September 18, 2023**

APPEARANCES:

    *Dennis W. McNamara* **for Appellant**

    *Raymond Kelly Hamilton* **for Appellee**

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Timothy A. Bruce ("Timothy") appeals the judgment of the Union County Court of Common Pleas, arguing that he was denied his right to the effective assistance of counsel. This appeal is not primarily about whether Timothy is guilty of the charges against him but is ultimately about whether Timothy received a fair trial on the charges against him. For the reasons set forth below, the judgment of the trial court is reversed.

*Facts and Procedural History*

{¶2} R. is the daughter of Randy. In 2016, Randy moved to Florida to seek treatment for his substance abuse issues. At that time, Randy's mother, Kimberly, received custody of R. and became her primary caregiver. Kimberly has also functioned as the primary caregiver of her ex-husband, Timothy, since the time he had suffered a traumatic brain injury in a motor vehicle accident in 1999. This injury has affected Timothy's cognitive and physical abilities through the present day.

{¶3} While she had custody of R., Kimberly worked as a registered nurse. When Kimberly was at work, she would have Timothy supervise R. several days a week after school at his apartment. During this time, Kimberly's mother, Nancy, frequently visited with R. A family friend, Brandee, also lived with Kimberly and R. for roughly nine months in this general timeframe.

-2-

{¶4} In August of 2018, R. traveled to Florida to stay with Randy for roughly ten days. On August 7, 2018, R. had a conversation with her father in which she disclosed allegations of sexual misconduct that involved Timothy. At this time, R. was eight years old. Randy then proceeded to file a police report in Florida. As the misconduct was alleged to have occurred in Ohio, the police in Florida forwarded this report to the City of Marysville Division of Police in Ohio where Detective Dennis Flanagan ("Detective Flanagan") began an investigation into the allegations. A copy of this report was also forwarded to Molly Vance at Children's Services in Union County.

{¶5} After R. returned to Ohio, she was interviewed at the Center for Family Safety and Healing at Nationwide Children's Hospital ("Nationwide Hospital") on August 15, 2018. Nancy and Kimberly were present with R. during this process and discussed the allegations with the staff at Nationwide Hospital. After this interview, Detective Flanagan met with Kimberly, Nancy, and R. at Kimberly's house.

{¶6} On August 29, 2018, R.'s school received a report from a parent of a student that R. was watching pornography on her phone on the school bus. The school conducted an investigation into this matter but found no evidence on her phone that would corroborate the parent's report. On August 31, 2018, R. went to the office of the school nurse, Courtney Thompson, and then wrote down her allegations in a letter addressed to her teacher. This precipitated a conversation between R. and the school principal, Thomas Holdren.

{¶7} As part of his investigation, Detective Flanagan conducted interviews with Kimberly, Brandee, and Nancy. He also conducted a search of Timothy's apartment where he discovered pornographic DVDs and a laptop containing a number of pornographic materials. The police took these items into evidence as R. had alleged that Timothy had shown her pornographic videos on his television.

{¶8} On October 10, 2019, Timothy was indicted on one count of voyeurism in violation of R.C. 2907.08(C), a felony of the fifth degree; one count of disseminating matter harmful to juveniles in violation of R.C. 2907.31(A)(1), a felony of the fourth degree; one count of importuning in violation of R.C. 2907.07(A), a felony of the third degree; three counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), felonies of the third degree; and four counts of rape in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree.

{¶9} A jury trial on these charges occurred between February 28, 2022 and March 2, 2022. By this time, R. was eleven years old. On the first day of trial, the State called Randy and two employees of the Center for Family Safety and Healing at Nationwide Children's Hospital. On the second day of trial, the State began by calling the forensic nurse, Gail Hornor ("Hornor"), who had conducted a physical examination of R., to testify. At trial, Hornor affirmed that the medical examination did not produce any physical evidence to corroborate her allegations. Hornor testified that R.'s "exam was normal" but that these results did not foreclose the

possibility of the conduct alleged by R. (Mar. 1 Tr. 22-23). The State then had Thomas Holdren and Courtney Thompson testify before calling R. as a witness.

{¶10} On taking the stand, R. testified that, at various times beginning just after her seventh birthday, Timothy had shown her pornographic videos; watched her while she was showering; touched the insides of her privates with his fingers; put his tongue on her chest and genitals; and contacted parts of her body with his genitals, including her mouth. After this testimony, the State called Molly Vance and Detective Flanagan to testify.

{¶11} On the third day of trial, the Defense called Kimberly, Nancy, and Brandee to testify as witnesses. On March 3, 2022, the jury returned verdicts of guilty on all of the charges against Timothy. On March 24, 2022, the trial court sentenced Timothy and issued its judgment entry of sentencing. The trial court imposed multiple life sentences on Timothy without the possibility of parole.

*Assignment of Error*

{¶12} Timothy filed his notice of appeal on April 22, 2022. On appeal, he raises the following assignment of error:

> **Mr. Bruce was denied the effective assistance of counsel during his trial; Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 10 of the Ohio Constitution.**

Timothy argues that his counsel was deficient for his failure to object to the introduction of inadmissible exhibits or testimony on roughly thirty occasions that are identified in his brief.

*Legal Standard*

**{¶13}** "Under Ohio law, 'a properly licensed attorney is presumed to carry out his duties in a competent manner.'" *State v. Harvey*, 3d Dist. Marion No. 9-19-34, 2020-Ohio-329, ¶ 57, quoting *State v. Gee*, 3d Dist. Putnam No. 12-92-9, 1993 WL 270995 (July 22, 1993). "For this reason, the appellant has the burden of proving that he or she was denied the right to the effective assistance of counsel." *State v. Cartlidge*, 3d Dist. Seneca No. 13-19-44, 2020-Ohio-3615 ¶ 39. "In order to prove an ineffective assistance of counsel claim, the appellant must carry the burden of establishing (1) that his or her counsel's performance was deficient and (2) that this deficient performance prejudiced the defendant." *State v. McWay*, 3d Dist. Allen No. 1-17-42, 2018-Ohio-3618, ¶ 24, quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶14}** In order to establish deficient performance, the appellant must demonstrate that trial "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *State v. Morrissey*, 2022-Ohio-3519, 198 N.E.3d 554, ¶ 26 (3d Dist.), quoting *Strickland* at 687. "Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance." *McWay* at ¶ 24, quoting *State v. Pellegrini*, 3d Dist. Allen No. 1-12-30, 2013-Ohio-141, ¶ 40.

**{¶15}** "In order to establish prejudice, 'the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have

been different.'" *State v. Berry*, 3d Dist. Union No. 14-20-05, 2021-Ohio-1132, ¶ 122, quoting *State v. Bibbs*, 2016-Ohio-8396, 78 N.E.3d 343, ¶ 13 (3d Dist.). If the appellant does not establish one of these two prongs, the appellate court does not need to consider the facts of the case under the other prong of the test. *State v. Baker*, 3d Dist. Allen No. 1-17-61, 2018-Ohio-3431, ¶ 19, citing *State v. Walker*, 2016-Ohio-3499, 66 N.E.3d 349, ¶ 20 (3d Dist.).

*Legal Analysis*

**{¶16}** On appeal, Timothy argues that his defense counsel was deficient for failing to object on roughly thirty different occasions that he identifies in his brief. Timothy divides these instances of alleged deficient performance into four categories: impermissible other acts evidence, improper opinion testimony, inadmissible hearsay statements, and improper prosecutorial comments during closing arguments. In our analysis, we will divide these thirty alleged instances into the four categories used by Timothy and will then analyze whether each of these instances represents an error. After examining whether these identified instances constituted errors, we will turn to examining whether Timothy carried the burden of demonstrating prejudice.

I. Deficient Performance Analysis: Other Acts Evidence

**{¶17}** "A hallmark of the American criminal justice system is the principle that proof that the accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or

-7-

inclination to commit crime." *State v. Sutherland*, 2021-Ohio-2433, 173 N.E.3d 942, ¶ 8 (2d Dist.), quoting *State v. Curry*, 43 Ohio St.2d 66, 68, 330 N.E.2d 720 (1975), citing 1 *Underhill's Criminal Evidence*, Section 205, 595 (6th Ed. 1973). The reasons for this principle are

> (1) The overstrong tendency to believe the defendant guilty of the charge merely because he is a person likely to do such acts; (2) the tendency to condemn not because he is believed guilty of the present charge but because he has escaped punishment from other offenses; (3) the injustice of attacking one who is not prepared to demonstrate the attacking evidence is fabricated; and (4) the confusion of issues which might result from bringing in evidence of other crimes.'

*Curry* at 68, quoting *Whitty v. State*, 34 Wis.2d 278, 292, 149 N.W.2d 557, 563 (1967). This logic extends to evidence of other prior wrongs or bad acts. *State v. Merritt*, 7th Dist. Jefferson No. 09 JE 26, 2011-Ohio-1468, ¶ 19. For this reason, "[a]s a general rule[,] evidence of prior crimes, wrongs, or bad acts is inadmissible if it is wholly independent of the charge for which an accused is on trial. *State v. Fannon*, 2018-Ohio-5242, 117 N.E.3d 10, ¶ 67 (4th Dist.).

{¶18} "Evid.R. 404(B)[(1)] categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime." *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, 165 N.E.3d 1123, ¶ 36, citing Evid.R. 404(B). In other words, "evidence which tends to show that the accused has committed other crimes or acts independent of the crime for which he stands trial is not admissible to prove a defendant's character or that the defendant acted in conformity therewith." *State v.*

*Wendel*, 2016-Ohio-7915, 74 N.E.3d 806 (3d Dist.), quoting *State v. Hawthorne*, 7th Dist. Columbiana No. 04 CO 56, 2005-Ohio-6779, ¶ 24. *See* Evid.R. 404(A).

**{¶19}** However, Evid.R. 404(B)(2) contains a list of permitted uses for evidence of other crimes, wrongs, or acts. Evid.R. 404(B)(2). This provision states that such evidence may be used to establish "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 404(B)(2).

> The admissibility of other acts evidence is 'carefully limited because of the substantial danger that the jury will convict the defendant solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crime charged in the indictment.'

*State v. Jones*, 4th Dist. Scioto No. 06CA3116, 2008-Ohio-968, ¶ 33, quoting *In re Sturm*, 4th Dist. Washington No. 05CA35, 2006-Ohio-7101, ¶ 51.

**{¶20}** "In determining whether other acts evidence is admissible, the Ohio Supreme Court has set forth a three-step analysis." *State v. Richey*, 2021-Ohio-1461, 170 N.E.3d 933, ¶ 37 (3d Dist.), citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 19-20.

> 'The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.' [*Williams* at] ¶ 20, citing Evid.R. 401. *See also* [*State v.*] *Hartman*[, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651,] ¶ 24, 28.

*State v. Williams*, 3d Dist. Allen No. 1-19-70, 2021-Ohio-256, ¶ 16. "The threshold question is whether the evidence is relevant." *Smith* at ¶ 37. "The rule governing

the admissibility of other-acts evidence does not bypass the relevancy determination." *Hartman* at ¶ 25.

> 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Evid.R. 401. "Evidence which is not relevant is not admissible." Evid.R. 402. However,

> the problem with other-acts evidence is rarely that it is irrelevant; often, it is too relevant. *Hartman* at ¶ 25; *see* 1A Wigmore, Evidence, Section 58.2, at 1212 (Tillers Rev. 1983). In the Evid.R. 404(B) context, the relevance examination asks whether the proffered evidence is relevant to the particular purpose for which it is offered, as well as whether it is relevant to an issue that is actually in dispute. *Hartman* at ¶ 26-27.

*Smith* at ¶ 37. For this reason, "the inquiry is not whether the other-acts evidence is relevant to the ultimate determination of guilt. Rather, the court must evaluate whether the evidence is relevant to the particular purpose for which it is offered." *Hartman* at ¶ 26.

> 'The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B).'

*Williams*, 2021-Ohio-256, ¶ 16 (3d Dist.), quoting *Williams*, 2012-Ohio-5695, ¶ 19-20. "The key is that the [other acts] evidence must prove something other than the defendant's disposition to commit certain acts." *Smith, supra*, at ¶ 36, quoting

-10-

*Hartman, supra*, at ¶ 22. These first two steps of the Ohio Supreme Court's analysis present questions of law and are subject to a de novo standard of review on appeal. *State v. McDaniel*, 2021-Ohio-724, 168 N.E.3d 910, ¶ 17 (1st Dist.). *Hartman, supra,* at ¶ 22, citing Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events*, Section 4.10 (2d Ed.2019) ("[d]etermining whether the evidence is offered for an impermissible purpose does not involve the exercise of discretion * * *, an appellate court should scrutinize the [trial court's] finding under a de novo standard").

{¶21} However, "[t]he analysis does not end once a proponent has established a permissible nonpropensity purpose for the admission of other-acts evidence." *Hartman, supra*, at ¶ 29.

> 'The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.' *Williams*[, 2012-Ohio-5695,] ¶ 20, citing Evid.R. 403. *See also Hartman* at ¶ 29.

*Williams*, 2021-Ohio-256, at ¶ 16. "As the importance of the factual dispute for which the evidence is offered to the resolution of the case increases, the probative value of the evidence also increases and the risk of unfair prejudice decreases." *Hartman, supra*, at ¶ 31.

{¶22} This third step "constitutes a judgment call which we review for abuse of discretion." *McDaniel* at ¶ 17. *See Hartman*, *supra*, at ¶ 30 (holding that "[b]alancing the risks and benefits of the evidence necessarily involves an exercise

of judgment; thus, the trial court's determination should be reviewed for an abuse of discretion"). Thus, "[i]n the absence of an abuse of discretion and a showing of material prejudice, 'an appellate court will not disturb a trial court's ruling as to the admissibility of evidence.'" *State v. Brentlinger*, 2017-Ohio-2588, 90 N.E.3d 200, ¶ 46 (3d Dist.), quoting *State v. Rollison*, 3d Dist. Marion 9-09-51, 2010-Ohio-2162, ¶ 32. "An abuse of discretion has been described as an unreasonable, arbitrary or unconscionable decision." *State v. Harris*, 3d Dist. Hancock No. 5-99-14, 1999 WL 797159 (Sept. 30, 1999). "[E]vidence of other crimes, wrongs or bad acts carries the potential for the most virulent kind of prejudice for the accused." *State v. Porter*, 2d Dist. Montgomery No. 28288, 2019-Ohio-4482, ¶ 12. For this reason, Evid.R. 404(B) "must be strictly construed against the admissibility of such evidence." *State v. Pearson,* 114 Ohio App.3d 168, 185, 682 N.E.2d 1086, 1897 (3d Dist. 1996).

{¶23} On appeal, Timothy identifies eleven instances where he argues improper other acts testimony was introduced at his trial. These eleven instances fall into three main categories. The first five instances relate to his sexual history, including his alleged association with prostitutes. (Mar. 1 Tr. 158, 183; Mar. 2 Tr. 60, 129-130, 131). The next three instances relate to Timothy's use or possession of various pornographic materials. (Mar. 1 Tr. 157, 160, 176, 182). The final three of these identified instances relate to his alleged drug use. (Feb. 28 Tr. 58; Mar. 1 Tr. 160; Mar. 2 Tr. 52). For the sake of clarity, we will examine these eleven instances in three separate analyses based on the preceding categorizations.

A. Other Acts Evidence: Sexual History

{¶24} Timothy identifies five instances in which he argues the State improperly introduced other acts evidence that related to his sexual history. The first, second, third, and fourth instances address discussions of Timothy's possible involvement with prostitutes or adult escorts. The fifth instance is testimony about a comment that Timothy made to Kimberly. We will address these two groupings of challenged testimony in separate analyses.

{¶25} *First, Second, Third, and Fourth Instances*: The State questioned Detective Flanagan on direct examination about whether Timothy had previously had "any adult female visitors who were not Kim[.], Brandee [a family friend], [or] Nancy [Kimberly's mother] [.]" (Mar. 1 Tr. 157). Detective Flanagan answered in the affirmative and then stated the following:

> What we learned during our investigation was that after Mr. Bruce's traffic accident, he still had sexual urges, was considered by family members to be very sexually driven and so, he started frequenting a website called Back Page. Back Page, at one time, was one of the largest pornographic websites in the United States and it gained quite a bit of notoriety for its ties to prostitution and sex trafficking. It had a personal ad's page where it would advertise for adult companionship, was essentially it was a cover for prostitution. Mr. Bruce began frequenting this site and on, at least, two to three occasions he did, in fact, order prostitutes to come to his apartment. This was verified by family members who refer to these visits as adult dates.

*Id*. at 158. The following exchange then occurred:

> [Prosecutor:] So, I want to make sure. So, his own family members contended to you that Tim Bruce was getting prostitutes to his home?

[Detective Flanagan:]  Yes.

[Prosecutor:]  And did I hear you say they called them adult dates?

[Detective Flanagan:]  Adult dates to take care of the urges he was having.

*Id.* at 158.[1]  He later testified that Back Pages "was shut down in April of 2018 after a Federal investigation" and that Timothy's alleged activities on this site would have been illegal.  *Id.* at 183.  The following exchange then occurred:

[Defense Counsel:]  Okay.  So, was that activity of scheduling this type of thing, if in fact true, was that illegal?

[Detective Flanagan:]  Scheduling those types of visits, yes, that was illegal but by the time the investigation started, the site had gone down and I had been told by the family that Mr. Bruce no longer accessed that site because of the scrutiny it was getting from law enforcement.

*Id.*  However, according to Detective Flanagan's testimony, no charges relating to these activities were ever brought against Timothy.  The charges in the indictment in this case certainly did not arise from these specific activities.  Further, Detective Flanagan's testimony on this matter also relied entirely upon hearsay statements from multiple sources.  We also note that, as Timothy points out is his brief, the State did not provide advance notice of its intention to use other acts evidence at trial in compliance with Evid.R. 404(B).

---

[1] In his brief, Timothy also challenges the testimony identified in this first instance as containing inadmissible hearsay in addition to being improper other acts evidence.

{¶26} In the second challenged instance, the prosecutor again brought up the subject of prostitution when questioning Nancy in the following exchange:

[Prosecutor:] But you said [in the recorded interview] * * *, quote, I remember one night there was a girl there. Never seen before. Maybe 20 or 30 with Tim and when I asked Kim, she said, Tim's friend brought her from Columbus, end quote.

[Nancy:] Okay.

* * *

[Prosecutor:] Do you remember that incident?

[Nancy:] Yeah, I do remember—I do remember Kimmy telling me that, yeah.

[Prosecutor:] And so, that girl you saw there that was 20 or 30 years old * * * tell me what you remember about that.

[Nancy:] Um, well, I can tell you what she looks like.

[Prosecutor:] Go ahead, please.

[Nancy:] You know, if I'm right, um, kind of—short, okay. Pretty short. Blond hair. A nice young lady, you know, and she was there to see Tim.

[Prosecutor:] Okay. Short blond hair, you said?

[Nancy:] I just said blond hair.

[Prosecutor:] You said she was short?

[Nancy:] Yeah, she was—she was.

[Prosecutor:] She was short?

[Nancy:] She was not tall. Let's put it that way.

* * *

[Prosecutor:]  And she had blond hair?

[Nancy:]  I believe so.

[Prosecutor:]  Okay, and what was your understanding why she was there?

[Nancy:]  She was a friend of Tim's.  I mean, to—to—how would I call it.  Um, to be his mate or something.  I mean, they—I don't know if you would call it dating because, you know, she stayed—I believe she stayed there a little while, you know.

[Prosecutor:]  She stayed there that evening?

[Nancy:]  Yeah, and you know, like I said, you know, I didn't take it much further than that but Tim—you know, Tim liked her.  I know that.  You know, I think he kind of had a crush on her.

(Mar. 2 Tr. 130-132).  We note that this exchange began with Nancy's prior statement of what Kimberly had reportedly told her.  Further, the prosecution requested a description of this alleged prostitute and then asked for these details to be repeated.  Dwelling on such inarguably irrelevant details only served to needlessly prolong a line of questioning into a highly prejudicial topic.

{¶27} In the third instance, Timothy identifies another exchange that the prosecution had with Nancy on the subject of his involvement with adult escorts:

[Prosecutor:]  During that same interview with Detective Flanagan * * * that I referenced * * *, Detective Flanagan asked you if you had any knowledge about prostitutes and Tim Bruce.

[Nancy:]  Uh-huh.

[Prosecutor:]  Do you remember what you told him?

-16-

[Nancy:] Um, no, I don't remember but—

[Prosecutor:] Do you remember anything about prostitutes and Tim Bruce?

[Nancy:] Um, I know somebody took him there for his birthday one time.

[Prosecutor:] Okay. Keep elaborating.

[Nancy:] Huh?

[Prosecutor:] Keep—you said somebody took him there for his birthday?

[Nancy:] Yeah, I wasn't there, so I don't know if they found one or not. I just know that was supposed to be a birthday present.

(Mar. 2 Tr. 129-130). We note that it is not clear from these statements that Nancy had the knowledge required to verify whether a prostitute was, in fact, obtained as a "birthday present" for Timothy; whether Timothy was aware that a prostitute was potentially being procured for him; or any of the other circumstances surrounding this rumored plan. *Id*. at 130.

{¶28} In the fourth instance, while questioning Kimberly, the prosecution yet again brought up the subject of Timothy's prior involvement with prostitutes:

[Prosecutor:] So, let's go to—have you ever been involved in knowledge that Mr. Bruce has undertaken efforts to have prostitutes visit him?

[Kimberly:] Yes.

[Prosecutor:] Explain your understanding of that.

[Kimberly:] Of him having them?

-17-

[Prosecutor:] Yes, ma'am.

[Kimberly:] He—I don't understand what you're asking me. He had one—he had one come to the house. Is that what you're asking?

[Prosecutor:] Well, you had shared with Detective Flanagan * * * as have several others that may or may not testify that Mr. Bruce has undertaken the use of prostitutes?

[Kimberly:] Once.

[Prosecutor:] Only once, as far as you know?

[Kimberly:] Yes.

[Prosecutor:] Okay, and describe that one time. Let me have the details. Not what actually may have happened but tell me how it was set up.

[Kimberly:] I don't know if I—I don't remember how it was—I don't know. I mean, I'm not saying I didn't know but I'm not remembering it at this moment. I think it was Back Page.

[Prosecutor:] Okay. Give me a time frame of when this occurred?

[Kimberly:] I don't know that either. I can't remember. It's been so long.

[Prosecutor:] Oh, * * * I understand you can't remember, so let's narrow it down. Narrow down the timeframe when you think this Back Page was used by Mr. Bruce to obtain a prostitute?

[Defense Counsel:] Objection. She already says she doesn't remember.

[Kimberly:] I don't remember.

[Prosecutor:] I'm asking clarifying questions.

[Kimberly:] I don't—don't remember.

[Defense Counsel:]  Ruling, please?

[Trial Court:]  Sustained at this point.

[Prosecutor:]  So, you can't remember.  Let me see if we can jog your memory.  How old was R[.] at the time when this occurred?

[Kimberly:]  I don't remember that either.  I don't even remember if it was before or after or, I think, it was before.  I'm not sure.

(Mar. 2 Tr. 58-60).  Notably, while defense counsel did raise an objection during this exchange, it was not on the basis of this testimony being irrelevant or inadmissible other acts evidence.  We turn now to analyzing these four challenged instances of other acts evidence.[2]

{¶29} As an initial matter, we note that Detective Flanagan indicated during his testimony that these alleged activities with prostitutes were illegal.  "The Ohio Supreme Court has held that, '[a]s a general rule, the introduction of evidence tending to show that a defendant has committed another crime *wholly independent* of the offense for which he is on trial is prohibited.'"  (Emphasis sic.)  *State v. Sutherland*, 92 Ohio App.3d 840, 847, 637 N.E.2d 366, 370 (3d Dist. 1994), quoting *State v. Adams*, 53 Ohio St.2d 223, 230, 374 N.E.2d 137, 141 (1978), *judgment vacated in part on other grounds in Adams v. Ohio*, 439 U.S. 811, 99 S.Ct. 69, 58

---

[2] There is yet another instance of the State bringing up Timothy's potential association with prostitutes that is not challenged on appeal.  While cross-examining Brandee, the prosecution stated, "Well what about the one time and I can play it for you in the interview, if you'd like, that you shared with Detective Flanagan, about when Tim Bruce got a prostitute and the prostitute gave him his money back.  Do you remember sharing that with Detective Flanagan?" (Mar. 2 Tr. 106-107).  In her testimony, Brandee confirmed that she had heard about this situation and indicated that the information she had was secondhand.  Thus, the State brought up the topic of Timothy's potential association with prostitutes on five occasions while questioning four different witnesses.

L.Ed.2d 103 (1978). "The introduction of 'substantial evidence of the circumstances and facts involved in the commission of [a prior] crime,' may warrant reversal even when the crime itself is admissible." *State v. Cantrell*, 4th Dist. Ross No. 96 CA 2255, 1997 WL 414974, *3 (July 27, 1997), quoting *Sutherland* at 848.

{¶30} In this case, the jurors heard Detective Flanagan testify that Timothy's alleged involvement with prostitutes as detailed would constitute illegal activities. However, these potentially illegal activities were in no way related to the charges against him. The State returned to this highly prejudicial line of questioning on multiple occasions. Further, beyond its irrelevance to this trial, the testimony on this subject was, at times, vague and included secondhand information, raising serious questions about the general reliability of a number of these statements.

{¶31} On appeal, the State points to the fact that the crime of gross sexual imposition requires proof that the defendant "ha[d] sexual contact with another." R.C. 2907.05(A). In turn, the definition of "sexual contact" requires that the touching was undertaken "for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). The State argues that this testimony about Timothy's potential involvement with prostitutes was necessary to establish that he was capable of arousal or sexual gratification after his traumatic brain injury. We turn to examining this argument under the third step of the test provided in *State v. Williams*, 2012-Ohio-5695, at ¶ 20.

**{¶32}** The third step in examining the admissibility of other acts evidence "is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *See Williams, supra*, at ¶ 16.

> Probative value is measured partially by the relative scarcity of evidence on the same issue; that is, if the state offers evidence for which there is an evidentiary alternative that has substantially similar or greater probative value but is less prejudicial, the probative value of the state's evidence must be discounted. [*State v. Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, 84 N.E.3d 981, ¶ 22], citing *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). 'The danger of unfair prejudice is then weighed against this reduced probative value.' *Creech* at [¶ 22].

*State v. Day*, 8th Dist. Cuyahoga No. 108435, 2020-Ohio-5259, ¶ 46, quoting *State v. Alexander*, 8th Dist. Cuyahoga No. 106556, 2019-Ohio-451, ¶ 36. Further,

> [s]exually deviant acts * * * carry a severe social stigma, leading to an increased risk that other sexually deviant acts by the defendant will influence a jury to convict because it assumes the defendant is a bad man.

*State v. Morris*, 2012-Ohio-6151, 985 N.E.2d 274, ¶ 56 (9th Dist.).

**{¶33}** Even assuming that the State needed to engage in special efforts to establish that Timothy was capable of arousal due to his traumatic brain injury and that this was a valid use of other acts evidence,[3] there were ample evidentiary

[3] The State argues that evidence about whether Timothy was capable of sexual arousal was necessary because Kimberly testified that "it was physically 'impossible' for Appellant [Timothy] to commit the crimes." (Appellee's Brief, 8, citing Mar. 2 Tr. 19, 24, 32). However, Kimberly's trial testimony did not assert that Timothy's traumatic brain injury rendered him incapable of sexual arousal or gratification. Rather, her testimony suggested that Timothy was physically incapable of dragging R. up the stairs as R. had alleged. We also note that the State was the party that introduced evidence at trial of Timothy's potential impotence. (*See* Mar. 2 Tr. 106-107). Nonetheless, we will consider the State's argument on its own terms.

alternatives to this testimony about prostitution that could establish that he was capable of arousal or sexual gratification. Further, the evidentiary alternatives not only existed but were introduced at trial and explored at length. For example, while being cross-examined by the State, Kimberly affirmed that Timothy was "very sexually driven as a result of his TBI [traumatic brain injury]"; that Timothy "wants sexual gratification"; and that he had pornographic movies in his possession for the purpose of attaining sexual gratification. (Mar. 2 Tr. 57-58, 69).

{¶34} The State also introduced an abundance of evidence about Timothy's possession of pornographic materials. Later in our analysis, we will discuss several challenges that Timothy raises to the admission of some of the evidence about these pornographic materials. However, Timothy does not challenge all of this evidence as he concedes that much of it relates to the charge of disseminating matter harmful to juveniles or aspects of R.'s allegations. For example, he does not challenge the evidence that seventy different pornographic items were discovered on his laptop; that he had pornographic DVDs in his possession; that he had access to pornographic materials on his cable television; and that he had hard core pornographic videos.

{¶35} This unchallenged evidence about these pornographic materials, at least bears some relationship to the allegations raised by R. and is relevant to a charge against Timothy. Again, even assuming the State had to take special efforts in this case to establish that Timothy was capable of arousal, the availability of

ample evidentiary alternatives to establish this fact renders this unfairly prejudicial testimony about prostitutes completely unnecessary and reduces to near nonexistence any arguable probative value that this challenged testimony may have had. The danger of unfair prejudice far outweighs any arguable probative value possessed by this evidence. "A strict interpretation" of the allowable uses of other acts evidence "does not permit such cumulative or 'piled on' evidence." *State v. Strong*, 119 Ohio App. 31, 37, 196 N.E.2d 801, 806 (5th Dist. 1963).

**{¶36}** In summary, this highly prejudicial testimony about Timothy's potential association with prostitutes was not relevant to the charges at trial. *Williams*, 2012-Ohio-5695, at ¶ 20. This testimony does not further any of the permissible purposes for the introduction of other acts evidence that are set forth in Evid.R. 404(B).[4] This testimony is far more unfairly prejudicial than valuable as probative evidence of a fact at issue at trial. For these reasons, the evidence related to Timothy's alleged activities with prostitutes should not have been elicited at trial but, once introduced, should have prompted an objection and been excluded.

**{¶37}** *Fifth Instance*: After questioning Kimberly about Timothy's prior involvement with prostitutes, the prosecutor inquired into an incident in which

---

[4] During closing arguments, the State returned to the topic of Timothy's potential involvement with prostitutes, saying that Kimberly "knows he's gotten prostitutes and yet [R.] * * * continues to go over there" for babysitting. (Emphasis added.) (Mar. 2 Tr. 154). *See also Id*. at 158. In this statement, the prosecutor directly linked the testimony about the adult escorts to evaluation of whether Timothy was a suitable childcare provider or was dangerous given the propensities indicative of these illegal or harmful behaviors. Thus, the prosecutor's own use of this information in closing arguments suggests that this testimony was impermissible propensity evidence.

Timothy had made a comment to Kimberly that she later reported in an interview to Detective Flanagan. Timothy challenges the resulting testimony as being "[i]n the same vein" as the testimony about Timothy's alleged association with adult escorts. (Appellant's Brief, 11). The challenged exchange reads as follows:

> [Prosecutor:] Did you ever tell Detective Flanagan, as you were explaining your understanding of Tim Bruce's sexual desires and proclivities that Tim had shared with you that—or you had shared with Detective Flanagan, I should say, that Tim told a woman he wanted to pin her legs behind her head like a Tyson chicken?
>
> [Kimberly:] Yeah.
>
> [Prosecutor:] Tell me about that incident.
>
> [Kimberly:] Um, he has said things inappropriately sexually which is common with head injuries but saying it and doing it's two different things.
>
> [Prosecutor:] So, you just said as a nurse—you're a home healthcare nurse. We're going to get into that here in a minute but you just said people with brain injuries, they sometimes say sexual things that are in appropriate. Is that accurate?
>
> [Kimberly:] Yes.
>
> * * *
>
> [Prosecutor:] Let me ask you this. So you know about the porn. You know about the prostitutes. You know about, as you said, people with traumatic brain injuries are *likely to say inappropriate things* and yet you still sent you granddaughter, R[.], over to stay with him?
>
> [Kimberly:] Yes.
>
> [Prosecutor:] Did you think that was appropriate?
>
> [Kimberly:] Yes or I wouldn't have done it.

-24-

[Prosecutor:]  Did you leave [R.] with Mr. Bruce by herself?

[Kimberly:]  Yes.

(Emphasis added.)  (Mar. 2 Tr. 60-61.)[5]  After this line of inquiry, the prosecution tied Timothy's comment, his possession of pornographic materials, and his possible association with prostitutes into questions about Kimberly's evaluation of Timothy's character.  The conclusion of this exchange suggests that this testimony was elicited for the impermissible purpose of suggesting that Timothy had a propensity to commit the charged crimes because of these prior activities.

{¶38} Timothy's comment, as relayed through Kimberly, was derived from a situation that was extraneous to the alleged acts that formed the basis of the charges in this case.  As noted previously, the prosecution already had an abundance of evidence that could be relied upon to establish that Timothy was capable of arousal or sexual gratification, making this testimony unnecessary for the purpose offered by the State on appeal for the admission of this evidence.  Finally, this comment was tied into an assessment of Timothy's propensities.

> [The] purpose [of propensity evidence] is to demonstrate that the accused has a propensity or proclivity to commit the crime in question. *See* [*State v.*] *Curry*[, 43 Ohio St.2d 66,] 68, 330 N.E.2d 720 [(1975)]. Evid.R. 404(B) categorically bars the use of other-acts evidence to show propensity.

---

[5] Timothy also challenges this testimony from Kimberly as containing inadmissible hearsay.  However, in this appeal, we need only address whether this testimony was permissible as other acts evidence.

*Hartman, supra*, at ¶ 21. *See State v. Ceron*, 8th Dist. Cuyahoga No. 99388, 2013-Ohio-5241, ¶ 82-84 ("[T]here is a fundamental difference between a man's desire to engage in sexual activity with * * * [an] adult * * * and his desire to rape [a] * * * little girl."), quoting *Morris, supra*, at ¶ 28. For these reasons, the testimony about this statement should have prompted an objection from defense counsel and should have been excluded at trial.

### B. Pornographic Materials

**{¶39}** In his brief, Timothy acknowledges that R. had alleged that he had shown her pornographic materials. Timothy also admits that the testimony about his possession of pornography that he does not challenge in this appeal was relevant to the charge against him for disseminating matter harmful to juveniles. *See State v. Gawron*, 7th Dist. Belmont No. 20 BE 0009, 2021-Ohio-3634, ¶ 45. For these reasons, he does not challenge all of the references to his possession of pornography that were made at trial. However, he challenges three main portions of Detective Flanagan's trial testimony that were related to his possession or use of pornographic materials. We will address the first two portions of Detective Flanagan's testimony together before we address the third challenged portion of his testimony.

**{¶40}** *First and Second Instances*: Before the prosecution elicited the challenged portions of testimony, Detective Flanagan was asked whether he discovered materials in Timothy's possession that could corroborate R.'s allegations that Timothy had exposed her to pornography.

> As a result of our investigation, we were able to learn that there were quite a few pornographic images on that computer. In fact, 70 different items were tagged for pornography. These included websites, videos, adult chat rooms and adult webcams. * * *
>
> The investigation revealed that Mr. Bruce did have cable service at that apartment. That cable service allowed him to access premium channels and adult channels, so he did have access to pornographic movies. He, also, had a DVR device as part of his cable package which would allow him to download various movies.
>
> While I was searching the bedroom, I noticed that the cable box was on top of a small stand. When I opened the bottom drawer of the stand, I found pornographic videos in the stand. When I looked at the contents of the video, I found that the—they were DVD's. It did match what was represented on the DVD cover. These were not illegal. They were hard core pornography but they were not illegal pornography, so the covers were photographed but the videos were not seized.

(Mar. 1 Tr. 156-157).[6] After this statement, the prosecution turned to eliciting the first portion of Detective Flanagan's testimony that Timothy challenges on appeal by asking for the titles of these videos. In response, Detective Flanagan stated:

> Um, one was called 'Sex Star MILF.' MILF is an acronym part of for mom I'd like to f**k. The other three videos were essentially foot fetish videos. One was called 'Welcome to Footville.' The other one was 'Foot Sex.' And the third was 'My Feet-Your Meat, Volume Three.'

(Mar. 1 Tr. 157). In the second portion of challenged testimony, the prosecution returned to the topic of Timothy's foot fetish videos. Detective Flanagan testified

---

[6] Importantly, Timothy does *not* challenge this portion of Detective Flanagan's testimony on appeal. Our ruling on the admissibility of the foot fetish pornography does not address this quoted testimony. We quote this portion of his testimony only because it provides the context for the subsequent testimony about the foot fetish pornography that Timothy does challenge on appeal. Appellant's Brief, 11.

that he took several pictures of the pornographic films that were discovered in Timothy's possession. The following exchange occurred:

[Prosecutor:] State's Exhibit 25, what is depicted?

[Detective Flanagan:] This is Welcome to Footville. This is one of the three foot fetish videos that were contained in that drawer.

[Prosecutor:] Now, Detective, you used the word fetish. Would you spell that for purposes of the record?

[Detective Flanagan:] F-E-T-I-S-H.

[Prosecutor:] And you've had some training about fetishes?

[Detective Flanagan:] I have.

[Prosecutor:] And what is a fetish?

[Detective Flanagan:] A fetish video is, essentially, a video that creates sexual arousal by focusing on body parts other than the genital area, by focusing on objects or items or by focusing on some type of a sexually based act or theme. Um, with respect to this, when you're talking about body parts, generally, in most of your fetish videos, you're featuring women's breasts, legs, hair and particularly feet. Studies have indicated, roughly, 47 percent of your fetish videos are foot fetish videos.

[Prosecutor:] What was that percentage?

[Detective Flanagan:] Approximately 47 percent.

[Prosecutor:] State's Exhibit 26, what is depicted?

[Detective Flanagan:] This is the second video called Foot Lovers.

[Prosecutor:] And does it have depictions of a female in a state of undress?

[Detective Flanagan:] It does.

[Prosecutor:] And you see bare skin?

[Detective Flanagan:] Yes, you can.

[Prosecutor:] State's Exhibit Number 27, what is depicted here?

[Detective Flanagan:] This is the third video titled My Feet-Your Meat, Volume 3 and, again, this is something where, if you look on the cover, you can see that you have exposed male genitals in close proximity to women's feet which is, essentially, what you have in these type of fetish films.

(Mar. 1 Tr. 175-177). Explicit pictures of several of these DVD movie covers were introduced into evidence. We note that Detective Flanagan was asked whether R. "disclosed any titles of these DVD's that [he] * * * had found[.]" *Id.* at 185. In response, he answered that he had never interviewed R. and affirmed that she did not identify any of "these pornographic materials as the ones she had seen." *Id.* at 186.

{¶41} The evidence of Timothy's possession or use of pornography was extensive. Detective Flanagan testified about the discovery and nature of Timothy's pornographic materials. Brandee testified that she became aware of Timothy's pornography when she was cleaning his house and was asked why he might have had these materials. Among other things, the State questioned Kimberly about comments Timothy had made about his pornography; about whether she and Timothy were "involved in pornography" during their marriage; about whether

Timothy had given pornography to Randy when he was a child; and about why Timothy had may have had pornographic videos. (Mar 2 Tr. 51).[7, 8]

**{¶42}** Timothy also argues that the testimony about his possession of foot fetish pornography "had nothing to do with the allegations" against him. (Appellant's Brief, 11). Testimony about pornography discovered in a defendant's possession has been found to be admissible where these materials depict acts that are "similar in nature to the sexual acts committed with" the victim. *State v. Voorhis*, 3d Dist. Logan No. 8-07-23, 2008-Ohio-3224, ¶ 73. *See also State v. Mincey*, 2023-Ohio-472, 208 N.E.3d 1043, ¶ 31 (1st Dist.); *State v. Eichorn*, 5th Dist. Morrow No. 02 CA 953, 2003-Ohio-3415, ¶ 34.

**{¶43}** Beyond containing similar acts, the pornographic materials in these cited cases also depicted acts between adults and children that were roughly paralleled by an adult defendant and a child victim in the criminally charged acts. *Voorhis* at ¶ 73; *Eichorn, supra*, at ¶ *Mincey* at ¶ 31. However, in the case presently before this Court, the evidence produced at trial does not suggest that this foot fetish pornography was similar to the illegal acts that were alleged by R. or depicted any

---

[7] In this summary, we do not include the testimony regarding R.'s allegations that Timothy had shown her pornographic materials.

[8] In this summary, we also do not include the references to Timothy's pornography that were elicited by defense counsel on cross-examination. For example, defense counsel questioned Detective Flanagan about whether Timothy's pornographic materials were "VCR or were they all CD's," eliciting this information: "[t]he ones I found were the CD-DVD type. From speaking to family, I was told that at one time Mr. Bruce had a very extensive pornographic VCR collection but I did not find that in the apartment." (Mar. 1 Tr. 185).

sexual acts between adults and children. *See State v. Clemons*, 94 Ohio App.3d 701, 710, 641 N.E.2d 778, 784, (12th Dist.).

**{¶44}** Further, no evidence at trial suggests that the testimony about this foot fetish pornography was introduced to corroborate any of the allegations that R. had raised regarding the illicit materials that Timothy showed her. R.'s allegations contained very little information about the content of the pornographic videos that she viewed with Timothy. *See also State v. Ross*, 2d Dist. Montgomery No. 22958, 2010-Ohio-843, ¶ 112. On cross-examination, defense counsel elicited testimony that Detective Flanagan never had the opportunity to interview R. to determine if any of the pornographic materials that Timothy had showed her were from a movie of which she knew the title. He also testified that he did not, during his investigation, receive any information from R. that would indicate whether she viewed any of these particular movies or DVDs.

**{¶45}** Curiously, defense counsel elicited information from Detective Flanagan on cross-examination that should have been the basis of an earlier objection to the initial introduction of this challenged testimony on direct examination. Cross-examination is of limited effectiveness in counteracting the unfairly prejudicial effects of introducing irrelevant testimony about foot fetish pornography at trial and may have only served to belabor the discussion of this topic in this case. In the absence of another discernible reason, the introduction of this

testimony would ultimately serve the purpose of establishing that Timothy was a "sex-crazed pervert." *Morris, supra*, at ¶ 56.[9]

**{¶46}** *Third Instance*: The State questioned Detective Flanagan about Timothy's use of cable television to view pornographic materials after the charges in this case had been filed.

> [Prosecutor:]  You made mention that Mr. Bruce had access to cable.
>
> [Detective Flanagan:]  Yes.
>
> [Prosecutor:]  Um, did you do any investigation related to his access to * * * cable?  Like, did you do any follow up investigation?
>
> [Detective Flanagan:]  Yes.  He had access through a cable company called Spectrum.  They were the ones that confirmed that he was a cable subscriber and that he did have access to Premium packages and Pay-Per-View movies and that through these packages and Pay-Per-Views, he also had access to adult entertainment.
>
> [Prosecutor:]  So, as it related to the whole porn question, you found porn in his room.  Correct?
>
> [Detective Flanagan:]  Correct.
>
> [Prosecutor:]   And then you, also, found that he had access to downloads from the Internet which could or could not include porn.  Correct?
>
> [Detective Flanagan:]  Correct.

---

[9] During closing arguments, the prosecution returned to the topic of the foot fetish videos, saying "[t]hose particular videos, Detective Flanagan, he told me they were fetish videos.  He even used the percentage.  He said 47 percent of fetish videos involve feet and attractions." (Mar. 2 Tr. 159).  Given the irrelevance of this information to the facts of this case, the content of the record provides no other plausible reason to return to this statistic during closing arguments except to highlight Timothy's personal peccadillos.

[Prosecutor:] And it's my understanding your first testimony was you continued to investigate this matter all the way up to and to the present when we started trial. Is that accurate?

[Detective Flanagan:] That's correct.

[Prosecutor:] Does Mr. Bruce still have this access to cable or online downloads?

[Detective Flanagan:] Not through Spectrum. He terminated his membership in November of 2021 which, in and of itself, is not unusual. But then I learned that the previous month in October of 2021 he ordered $292 worth of Pay-Per-View movies. And then the following month his account was terminated.

[Prosecutor:] And I just want to make sure I have that number correctly. How much was it, again?

[Detective Flanagan:] Approximately, $292.

(Emphasis added.) (Mar. 1 Tr. 159-160). *See also Id*. at 182.

{¶47} We note that R. alleged that Timothy had shown her pornographic materials. While R. did not describe the contents of these videos in detail, she did describe how and where Timothy showed her these videos. R. testified, "he had them [the videos] saved on his TV, I think. His TV, like, where you can save things that are on TV like Roku." (Mar. 1 Tr. 111). She also stated that Timothy had showed her illicit videos on his computer. For this reason, some testimony that Timothy was able to access pornographic materials on his television and had accessed movies on Pay-Per-View could arguably provide some corroboration to R.'s testimony.

{¶48} However, the testimony regarding the amount of money he spent on Pay-Per-View movies after criminal charges were brought against him is irrelevant in the absence of any testimony that establishes that these $292.00 of purchases even included pornographic movies. Based on the testimony at trial, this information only establishes that Timothy watched a lot of movies, which is irrelevant to any fact at issue in this case. But beyond this issue, the context of this testimony at trial invites the jury to speculate about the content of these movies, suggesting that Timothy did not simply watch a lot of movies on Pay-Per-View but that he watched a lot of pornographic movies on Pay-Per-View when the evidence does not establish such a conclusion.

{¶49} If the prosecution could not establish that these purchases were of pornographic movies, then the extent of Timothy's Pay-Per-View movie watching goes beyond the plausibility of R.'s allegations and could only stoke speculation in this case.[10] Further, if the prosecution could establish that the Pay-Per-View movies

---

[10] We reach this conclusion in part because of how the prosecutor returned to this cable bill during closing arguments, saying Detective Flanagan "found out that Tim Bruce had spent $292 in that last month that he had the Pay-Per-View. Apparently, he either didn't want to pay it or wasn't happy with his views but he terminated his contract as an outstanding bill because, you see, that Pay-Per-View was how he could get pornography." (Mar. 2 Tr. 158-159). Initially, the fact that this bill went unpaid is irrelevant to this case. Further, the earlier testimony about these Pay-Per-View purchases does not clearly establish that Timothy had, in fact, accessed pornographic movies on his television but only established that he *could have* accessed such materials. Again, in the absence of additional testimony that established he did access pornographic materials, this information invites the jury to speculate about the nature and content of these Pay-Per-View movies. It also established an impermissible character trait of Timothy that the prosecutor freely used due to a lack of defense objection.

included pornographic materials, the admission of such evidence would still be subject to the standards of Evid.R. 402 and Evid.R. 403.

### C. Other Acts Evidence: Alleged Drug Use

{¶50} On appeal, Timothy challenges three main instances in which the prosecution elicited information about Timothy's prior history of drug use. We will consider the first two instances in one analysis before proceeding to a separate analysis of the third instance.

{¶51} *First and Second Instances*: First, R.'s father and Timothy's son, Randy, testified that he had surrendered custody of R. to his mother, Kimberly because he had entered rehabilitation in Florida to address his drug addiction. Randy indicated that he had a distant relationship with his father because Timothy "couldn't accept" that he "wanted to go get clean." (Feb. 28 Tr. 53, 54). The following exchange between the prosecutor and Randy then occurred:

> [Prosecutor:] Randy, you said that you're very distant from your father. You said, in your own words, something about some people couldn't accept that you were going to step away from the journey of addiction. Is that what you were referring to?
>
> [Randy:] Yep.
>
> [Prosecutor:] What do you mean by that?
>
> [Randy:] Initially, when I went to treatment, the first couple of months I was down there, I would occasionally get phone calls of I just wish you could be back up here. I miss hanging out. You know, I miss catching a buzz, doing this, doing that, and it just seemed to be that, you know, the old life was, you know, not something he could let go of. At least on my end of the spectrum.

[Prosecutor:] You used the word buzz?

[Randy:] Yes.

[Prosecutor:] What does that mean?

[Randy:] We used to smoke pot together.

[Prosecutor:] And your father wanted to continue that kind of behavior smoking pot. Is there another name for pot? The technical term?

[Randy:] Marijuana.

[Timothy Bruce:] Medical.

[Prosecutor:] And your father wanted to do that with you and you didn't want to do it anymore?

[Randy:] Correct.

(Feb. 28 Tr. 57-58). Second, the State brought up the issue of Timothy's prior drug use again, questioning Kimberly about whether she was aware that Randy and Timothy had used drugs together in the past:

[Prosecutor:] Do you know that your—Tim Bruce used drugs with your son, Randy?

[Kimberly:] When he was a kid?

[Prosecutor:] I didn't give a specification yet. I'm just asking, did you know if he used drugs? Tim Bruce used drugs with your son, Randy?

[Kimberly:] I know they have as an adult smoked pot.

(Mar. 2 Tr. 52). On appeal, the State argues that this testimony "elaborated upon the challenging grooming family dynamic" that Timothy "exacted upon the victim." (Appellee's Brief, 7). However, the testimony elicited does not indicate that Timothy "groomed" Randy for drug use in any way or even introduced Randy to drug use. Rather, this testimony only indicates that Randy, "as an adult," had used drugs alongside his father. (Mar. 2 Tr. 52). Beyond the fact that this testimony does not establish that Timothy groomed Randy for drug use, the act of introducing an adult to drug use is not similar to grooming a child for sexual abuse.

{¶52} The State's argument essentially admits that this evidence was introduced in an attempt to establish that Timothy had groomed Randy for drug abuse and that this prior behavior suggests that he may have groomed R. for sexual abuse. In other words, evidence of these other acts were introduced to suggest that Timothy had the character of a predator and "acted in accordance with th[is] character" in this case. Evid.R. 404(B)(1). This is precisely the kind of evidence that is prohibited by Evid.R. 404(B)(1). The State also does not allege that this evidence was introduced for any of the permissible reasons to use other acts evidence that are listed in Evid.R. 404(B)(2). For this reason, we conclude that this other acts testimony was not admissible evidence under Evid.R. 404(B).

{¶53} The State also argues that defense counsel broached the topic of Randy's relationship with Timothy on cross-examination, opening the door for the prosecution to engage in this line of inquiry.

> Under the opened-the-door doctrine, "[t]he introduction of otherwise inadmissible evidence * * * 'is permitted * * * "to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence."'" *State v. Bronner*, 9th Dist. Summit No. 20753, 2002-Ohio-4248, ¶ 73, quoting *United States v. Winston*, 447 F.2d 1236, 1240 (D.C. Cir. 1971), quoting *California Ins. Co. v. Allen*, 235 F.2d 178, 180 (5th Cir. 1956).

*State v. Cotton*, 12th Dist. Butler No. CA2022-05-055, 2023-Ohio-46, ¶ 15.

> [While] '[t]he introduction of evidence of other bad acts can be prejudicial and is generally prohibited by Evid.R. 404(B) * * *, courts will not find prejudicial error when the defense 'opens the door' to such evidence.

(Citations omitted.) *State v. Brooks*, 9th Dist. Medina No. 07 CA 0111-M, 2008-Ohio-3723, ¶ 53, quoting *State v. Moore*, 8th Dist. Cuyahoga No. 80416, 2003-Ohio-1154, ¶ 23.

**{¶54}** However, "the doctrine [of opening the door] is 'dangerously prone to overuse.'" *Bronner, supra,* at ¶ 72, quoting *Winston*, *supra*, at 1240, quoting *United States v. McClain*, 440 F.2d 241, 244 (C.A. D.C. 1971).

> [J]ust because a door creaks open, it does not allow a parade to march through. "It has been observed that 'opening the door is one thing. But what comes through the door is another. Everything cannot come through the door.'" *State v. Bronner*, 9th Dist. Summit No. 20753, 2002-Ohio-4248, 2002 WL 1906507, ¶ 72, quoting *United States v. Winston*, 447 F.2d 1236, 1240 (D.C. Cir. 1971). "'[T]he doctrine is to *prevent* prejudice and is not to be subverted into a rule for *injection* of prejudice.'" (Emphasis sic.) *Id*. at ¶ 73, quoting *Winston* at 1240.

*State v. McDaniel*, 2021-Ohio-724, 168 N.E.3d 910, ¶ 13 (1st Dist.).

**{¶55}** In this case, the State questioned Randy about his own history of drug use on direct examination. On cross-examination, the Defense questioned Randy

about his relationship with Timothy presumably to address issues of potential bias against Timothy. Randy's answer did not portray Timothy in a favorable light. Given that the State had already questioned Randy about his prior drug use on direct examination, we note that the prejudice from Randy's answer on cross-examination primarily accrued to Timothy rather than Randy.

{¶56} Further, even if the Defense opened the door for the prosecution to discuss the relationship between Randy and Timothy, the exchange between the State and Randy elicited information that went beyond what was necessary to understand their "family dynamic * * *." (Appellee's Brief, 6). *See also Bronner, supra,* at 72-76. This line of inquiry did *not* open the door for an exchange about Timothy's history of drug use. The State's questions about Timothy's history of drug use were not necessary to address the testimony elicited from Randy during cross-examination and sought unfairly prejudicial information that was ultimately irrelevant to any fact of consequence in this case.

{¶57} *Third Instance*: During the testimony of Detective Flanagan, the prosecution again returned to the topic of Timothy's prior drug use:

> [Prosecutor:] You heard Randy['s] * * * testimony that his father encouraged him to, quote, get buzzed, end quote. Did you hear that testimony?
>
> [Detective Flanagan:] Yes.
>
> [Prosecutor:] Did you find any evidence of drugs or what have you in Mr. Bruce's home * * *?

> [Detective Flanagan:] There was one small item. It appeared to be drug paraphernalia. I believe it was related to marijuana use. We did not find any type of illegal narcotics or illegal prescription meds.

(Mar. 1 Tr. 160). In this case, Timothy was not indicted on *any* charge that was related to illegal drug use. Further, R.'s allegations did not contain *any* mention of Timothy using *any* illegal drugs. Thus, "nothing connects the drug-related evidence with the charged offenses" in this case. *State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, 172 N.E.3d 8, ¶ 133.

{¶58} The State asserts that Detective Flanagan's testimony about the drug paraphernalia was "a demonstration of [the] investigative thoroughness" of law enforcement in this case. (Appellee's Brief, 7). However, the State does not cite to any caselaw that suggests establishing "investigative thoroughness" is a justification for the introduction of such testimony. *Id.* Under the facts of this case, the discovery of drug paraphernalia was in no way necessary to explain the actions of law enforcement as they conducted their investigation. This prejudicial evidence was irrelevant to any fact of consequence that was at issue at trial and should have prompted an objection by defense counsel. *See State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, ¶ 173-174. "Evidence which is not relevant is not admissible." Evid.R. 402.

{¶59} In summary, the parties presented evidence at trial on three days. Randy testified on February 28; Detective Flanagan testified on March 1; and Kimberly testified on March 2. Thus, the prosecution returned to the issue of

-40-

Timothy's prior drug use on each day of his trial. Randy's testimony did not open the door for the State to repeatedly bring up Timothy's prior history of drug use on three separate days during the examination of three different witnesses. Testimony about Timothy's prior drug history is ultimately irrelevant to the disposition of this case and was unfairly prejudicial.

## II. Deficient Performance Analysis: Opinion Testimony

{¶60} "In our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses." *State v. Eastham*, 39 Ohio St.3d 307, 312, 530 N.E.2d 409 (1988). For this reason, "[o]pinion testimony regarding another witness's credibility 'infringe[s] upon the role of the fact finder, who is charged with making determinations of veracity and credibility.'" *State v. Smith*, 2017-Ohio-9283, 102 N.E.3d 1111, ¶ 46 (10th Dist.), quoting *Eastham* at 312. "Generally, the opinion of a witness as to whether another witness is being truthful is inadmissible." *State v. Essa*, 194 Ohio App.3d 208, 2011-Ohio-2513, 955 N.E.2d 429, ¶ 90 (8th Dist.).

{¶61} However, Evid.R. 608(A) does permit some opinion evidence regarding the credibility of a witness under specified circumstances and reads as follows:

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible

only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

Evid.R. 608(A). "While Evid.R. 608(A) permits testimony regarding a witness's general character or reputation for truthfulness, the rule prohibits testimony regarding a witness's truthfulness on a particular occasion." *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 41.

**{¶62}** A distinction exists between lay and expert witnesses. *State v. McKee*, 91 Ohio St.3d 292, 2001-Ohio-41, 744 N.E.2d 737, fn. 2 (2001). "[L]ay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" *Id.,* quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992), *superseded on other grounds by statute*.

**{¶63}** Evid.R. 701 states that the testimony of a lay witness "is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701.

> Lay opinions, inferences, impressions, or conclusions are admissible if they are those that a rational person would form on the basis of the observed facts and if they assist the jury in understanding the testimony or delineating a fact in issue.

*State v. Marshall*, 8th Dist. Cuyahoga No. 100736, 2015-Ohio-2511, ¶ 25. Evid.R. 701 does not prohibit a lay witness from "testify[ing] about another's emotional state when the testimony is based upon personal observations." *State v. Kovac*, 150

Ohio App.3d 676, 2002-Ohio-6784, 782 N.E.2d 1185, ¶ 56 (2d Dist.).   But in accordance with the general rule, "lay witnesses are prohibited from testifying as to another witness's veracity." *Pawlak, supra*, at ¶ 113, citing *Kovac* at ¶ 32.

**{¶64}** "The state elicits such opinion evidence at its peril, particularly where the evidence essentially involves a credibility contest and significant independent evidence of the offenses * * * is lacking." *State v. Kennedy*, 11th Dist. Ashtabula No. 2021-A-0030, 2022-Ohio-3369, ¶ 20, quoting *State v. Miller*, 2d Dist. Montgomery No. 18102, 2001 WL 62793, *7 (June 26, 2001).   However, while "having a witness testify that the victim is telling the truth is an error, it is harmless error if the victim testifies and is subject to cross-examination." *State v. Hupp*, 3d Dist. Allen No. 1-08-21, 2009-Ohio-1912, ¶ 20.[11, 12]   This is because,

> [w]hen the victim testifies, the jury is able to hear the victim's answers, witness her demeanor and judge her credibility completely independent of the other's testimony concerning the veracity of the victim.

---

[11] In *State v. Boston*, the Ohio Supreme Court found reversible error where an expert witness gave impermissible opinion testimony regarding the veracity of allegations of sexual abuse that were raised by a child victim. *State v. Boston*, 46 Ohio St.3d 108, 129, 545 N.E.2d 1220 (1989), *overruled, in part, on other grounds by State v. Dever*, 64 Ohio St.3d 401, 1992-Ohio-41, 596 N.E.2d 436 (1992).   In *Hupp*, this Court considered *Boston* in the context of impermissible opinion testimony that was given by a lay witness. *Hupp, supra*, at ¶ 18-20.   We concluded that this impermissible opinion testimony constituted harmless error because the child victim testified at trial and was cross-examined. *Id*. at ¶ 20.   However, in the case presently before us, Timothy essentially raises a cumulative error argument to establish prejudice for his ineffective assistance of counsel claim. Appellant's Brief, 26.   Under the cumulative error doctrine, multiple harmless errors can provide a basis for a reversal. *State v. Line*, 3d Dist. Allen No. 1-19-07, 2019-Ohio-4221, ¶ 16.

[12] We note that courts have held, in cases with varying fact patterns, that the admission of impermissible opinion testimony "is more likely to be prejudicial if the case was essentially a 'credibility contest' between the victim and the defendant without independent evidence of the alleged crimes." *Kovac, supra*, at ¶ 40, quoting *State v. Palmer*, 9th Dist. Medina No. 2323-M, 1995 WL 48442 (Feb. 8, 1995). *See also State v. Johnson*, 5th Dist. Stark No. 2016CA00069, 2016-Ohio-8261, ¶ 54; *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 108 (6th Dist.); *State v. Schewirey*, 7th Dist. Mahoning No. 05 MA 155, 2006-Ohio-7054, ¶ 52; *Pawlak, supra*, at ¶ 116; *State v. Roush*, 10th Dist. Franklin No. 12AP-201, 2013-Ohio-3162, ¶ 62.

*Id.* at ¶ 20. *See also State v. Leigh*, 6th Dist. Ottawa No. OT-16-028, 2017-Ohio-7105, ¶ 24 (The error of admitting impermissible opinion testimony "is mitigated if the victim testifies and is subject to cross-examination."). Though instances of impermissible opinion testimony may constitute harmless errors, "the law provides that when multiple harmless errors are considered together, their combined effect may violate a defendant's right to a fair trial." *Rollison*, *supra*, at ¶ 50. We turn now to examining seven challenged instances of what Timothy argues was improper opinion testimony.[13]

{¶65} *First and Second Instances*: Molly Vance ("Vance") works for Logan County Children Services. She conducted an initial interview with R. before sending her to Nationwide Hospital for further investigation. During her testimony, the following exchange occurred:

> [Prosecutor:] And when you observed it [R.'s interview], what did you observe?
>
> [Vance:] * * * [S]he [R.] was pretty consistent with what she was saying. It seemed very credible. Um, she stuck to her story. Could give details. Um, so, when I left there I believed—I believed what she said.

---

[13] In his brief, Timothy identifies eight instances of improper opinion testimony. However, one of these instances is challenged as an inadmissible hearsay statement and as improper opinion testimony. We will address seven of these instances in this section and will address the eighth instance when we examine the statements challenged as inadmissible hearsay.

(Mar. 1 Tr. 130). In the second challenged instance of opinion testimony, Vance testified that she "and the CAC [Child Advocacy Center] staff felt she [R.] was very credible in her description." *Id*. at 133.

> Social workers are permitted to testify to their *disposition* in an alleged sexual abuse case. *See State v. Smelcer* (1993), 89 Ohio App.3d 115[, 623 N.E.2d 1219]. Social workers may also comment on the *consistency* of an alleged victim's statements. *See In re D.D.*, Cuyahoga App. No. 89042, 2008-Ohio-222 * * *; *In re W.P.*, Cuyahoga App. No. 84114, 2004-Ohio-6627 * * *; *State v. Demiduk* (June 24, 1998), Columbiana App. No. 96-CO-16 [1998 WL 355864 (7th Dist.)* * *. However, social workers may not testify as to the *truthfulness* or *credibility* of the alleged victim. *Id.*

(Emphasis sic). *State v. Winterich*, 8th Dist. Cuyahoga No. 89581, 2008-Ohio-1813, ¶ 21. *See also State v. Cashin*, 10th Dist. Franklin No. 22424, 2009-Ohio-6419, ¶ 20 ("[S]tatements directly supporting the veracity of a child witness are prohibited * * *.").

{¶66} In the first identified statement from Vance, she began by giving permissible testimony about her observations regarding the consistency and detailed nature of R.'s allegations. *State v. McGlowan*, 6th Dist. Lucas No. L-07-1163, 2009-Ohio-2160, ¶ 43 (A police detective's lay witness testimony regarding delayed disclosure was permissible where the detective never gave an opinion as to whether sexual abuse occurred in that case."); *State v. L.E.F.*, 10th Dist. Franklin No. 13AP-1042, 2014-Ohio-4585, ¶ 27 ("Witnesses involved in the examination of a sexual abuse victim may comment on the consistency of the victim's statements.").

{¶67} However, Vance concluded this statement by sharing her personal beliefs about the veracity of R.'s allegations. *Cook, supra*, at ¶ 41; *Winterich* at ¶ 23 (finding that a social worker's "opinion that the victim 'seemed believable' was improper"). Vance's personal belief in R.'s allegations does not assist the trier of fact in reaching a conclusion on the issue of whether sexual abuse had occurred but intrudes on the function of the jury as trier of fact. *Lawson, supra*, at ¶ 17, 22. This opinion testimony went to the central issue that the jury was to decide in this case and was impermissible.

{¶68} In the second identified statement, Vance gave the opinions of other staff members regarding the credibility of R.'s allegations. This testimony presumably reflected hearsay statements that had been made by other individuals to Vance. This testimony gave the opinions of unidentified declarants on the ultimate issue that was to be decided by the jury in this case. Further, the jurors, who had previously heard testimony from two CAC treatment providers, would likely have perceived the staff of the Child Advocacy Center as authorities on the matter of child sexual abuse allegations. For these reasons, this testimony was impermissible.

{¶69} *Third Instance*: The State called the nurse at R.'s school, Courtney Thompson ("Thompson"), to testify as a witness. Thompson stated that she had been involved when R. initially reported the allegations at school. During direct examination, the following exchange occurred:

[Prosecutor:] Did you detect that [R.] * * * was faking?

-46-

[Thompson:]  No.

[Prosecutor:]  Did you detect at all that [R.] * * * was just making all this up?

[Thompson:]  I don't believe that a third grader would be able to make all of that up unless that truly happened to her.  That's not something I typically see.

(Mar. 1 Tr. 65-66).  At trial, Thompson testified as a lay witness but gave an opinion about what was typical for third grade victims who raise allegations of sexual abuse.

> [C]ourts have permitted lay witnesses to express their opinions in areas in which it ordinarily would be expected that an expert must be qualified under Evid.R. 702. * * * Although these cases are of a technical nature in that they allow lay opinion testimony on a subject outside the realm of common knowledge, they still fall within the ambit of the rule's requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue.  These cases are not based on specialized knowledge within the scope of Evid.R. 702, but rather are based upon a layperson's personal knowledge and experience.

*State v. Jones*, 2015-Ohio-4116, 43 N.E.3d 833, ¶ 107 (2d Dist.), quoting *McKee*, supra, at 296-297.  Thus,

> courts have permitted witnesses with firsthand knowledge to offer lay opinion testimony where they have a reasonable basis—grounded either in experience or specialized knowledge—for arriving at the opinion expressed.

*McKee* at 296, quoting *Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Engineering*, 57 F.3d 1190, 1198 (3d Cir. 1995).

**{¶70}** On direct examination, Thompson did not give any testimony that establishes she had the knowledge or experience that was necessary to give an

opinion regarding what was typical for a third grader when disclosing allegations of sexual abuse. *State v. Sanchez*, 11th Dist. Ashtabula No. 2018-A-0097, 2020-Ohio-5576, ¶ 83. In fact, prior to these challenged statements, Thompson's testimony indicated that R.'s allegations came during the "first week of [Thompson's] * * * first year" of being a school nurse. (Mar. 1 Tr. 52). Thompson also indicated that this was her first-time reporting allegations of sexual abuse as a mandated reporter.

**{¶71}** Further, on cross-examination, Thompson confirmed that she had not previously "been involved in a situation like this before where a child made allegations[.]" (Mar. 1 Tr. 66).[14] Since Thompson had not previously dealt with a situation in which a child had raised sexual abuse allegations, she was clearly not qualified to give an opinion about what was typical in such cases. *See also Jones, supra*, at ¶ 108 (A police detective was permitted to testify about what was typical for child victims in sexual abuse cases where he had extensive experience in similar cases).

**{¶72}** Beyond this initial issue, courts have also found testimony about the rarity of child victims raising false allegations of sexual abuse to be problematic even where the witness has extensive experience in such cases. "Whether the victims in previous cases * * * were truthful and accurate is not relevant to the truth

---

[14] While these questions on cross-examination demonstrate that Timothy's defense counsel did, at least, take some steps to address this problematic testimony on some level, the substance of these facts had essentially been introduced already on direct examination.

or accuracy of * * * the incident at issue in this case." *State v. Coffman*, 130 Ohio App.3d 467, 476, 720 N.E.2d 545, 548-549 (3d Dist. 1998) (finding a police officer's testimony that, in his extensive experience in child sexual abuse cases, he had "never had anyone even near [the seven-year-old victim's] age where we knew for a fact they were lying" to be improper); *State v. Whitt*, 68 Ohio App.3d 752, 758, 589 N.E.2d 492, 495 (8th Dist. 1991); *State v. Davis*, 64 Ohio App.3d 334, 345, 581 N.E.2d 604, 611 (12th Dist. 1989). Thus, testimony of this nature from a lay witness who does not have extensive experience with these types of cases was problematic. Accordingly, we conclude that the portion of Thompson's testimony that Timothy challenges on appeal was impermissible.

**{¶73}** *Fourth Instance*: On direct examination, Randy was asked by the prosecutor what his goal was in filing a police report after R. had told him her allegations. In response, Randy said:

> Honestly, I—I need to say this. Um, I believed her wholeheartedly. I did because, like, this doesn't just come out of thin air in a child's mind but at the same time this was a very double edged sword for me. Um, I didn't know how to make the word like, you know, you say it and you believe it but at the same time, it doesn't make sense. Um, but the only thing that I could really think about in this moment was I know I have to do everything right in order to accomplish the goal of getting her back to me which is, ultimately, the safest place she can be.

(Feb. 28 Tr. 40-41). Randy then emphasized that this was important, "especially if all of this is a hundred percent true * * *." *Id*. at 41. This statement gave an opinion about "credibility of [an]other witness * * *." *Pawlak, supra*, at ¶ 109. While there

is no indication that the prosecution sought to elicit this answer, these statements still constituted impermissible opinion testimony and were not objected to by defense counsel.

**{¶74}** *Fifth Instance*: On redirect examination, the prosecution also asked about what Randy "detect[ed] as a dad" when he was watching the recorded interview of R. describing the allegations in detail. (Feb. 28 Tr. 57). Randy replied by saying, "My child has been harmed. My child is a victim. My child has been through stuff that no child should have to go through." *Id*. The State's question asked Randy what he perceived as he viewed a recorded interview of R. This is a matter within the knowledge of a lay witness.

**{¶75}** Portions of Randy's answer did suggest an opinion on the ultimate issue in this case. *See State v. Marrero*, 10th Dist. Franklin No. 10AP-344, 2011-Ohio-1390, ¶ 43, 46-48, citing *State v. Clemons*, 3d Dist. Allen No. 1-86-36, 1988 WL 37129, *6. In this case, whether R. had been harmed by sexual abuse was disputed. *State v. Aboytes*, 11th Dist. Lake No. 2020-L-001, 2020-Ohio-6806, ¶ 181 ("[T]he term 'victim' is used appropriately during trial when there is no doubt that a crime was committed and simply the identity of the perpetrators is in issue."); *State v. Madden*, 2017-Ohio-8894, 100 N.E.3d 1203, ¶ 34 (10th Dist.) (considering whether the fact that the complainant had suffered a harm was in dispute).

**{¶76}** However, courts have uniformly found that such testimony does not rise to the level of plain error. *State v. Donald*, 7th Dist. Mahoning No. 08 MA 154,

2009-Ohio-4638, ¶ 69; *State v. Jackson*, 2023-Ohio-455, 208 N.E.3d 1010, ¶ 26 (8th Dist.), citing *State v. Butts*, 8th Dist. Cuyahoga No. 108381, 2020-Ohio-1498, ¶ 41; *State v. Wright*, 9th Dist. Lorain No. 02CA008179, 2003-Ohio-3511, ¶ 3-5; *State v. Morock*, 10th Dist. Franklin No. 14AP-559, 2015-Ohio-3152, ¶ 25. We note that Randy's statement was the understandable response of a father. Given this context, we conclude that, even if this comment was impermissible, consideration of this statement need not enter into the final analysis of prejudice.

**{¶77}** *Sixth Instance*: On cross-examination, Randy was questioned by the Defense about R.'s honesty. On redirect examination, the prosecution referenced this line of questioning in the following exchange:

> [Prosecutor:] Randy, Mr. Valentine [Timothy's Defense Counsel] asked you if you knew about your daughter's habit of lying. Do you recall that?
>
> [Randy:] I do.
>
> [Prosecutor:] And does she have the habit of lying?
>
> [Randy:] No.
>
> [Prosecutor:] And you went on to start to explain your answer and so, I want to give you a chance to explain your answer now. When you said that she's like any other kid, what do you mean?
>
> [Randy:] She—if she sees herself getting extra attention from explaining something, she will exaggerate. She will push it out, drag it out further, you know, really, really accentuate details to, you know, push that connection or that going on.
>
> [Prosecutor:] Okay.

[Randy:]  So, I don't think necessarily it's a habit of lying as it is, you know, seeking attention.

(Feb. 28 Tr. 54-55).  On appeal, Timothy challenges this line of questioning as Randy "reaffirm[ing] his [prior] opinion testimony."  (Appellant's Brief, 12). However, this testimony came after the Defense had a long series of questions that delved into R.'s character for truthfulness on cross-examination.

**{¶78}** Each of the questions in this challenged portion of testimony addressed a specific line of inquiry pursued by the Defense on cross-examination. Further, unlike the first challenged instance above, Randy gave his opinion as to R.'s general character for truthfulness rather than his opinion as to whether her specific allegations against Timothy were true.  *See State v. Cook*, 3d Dist. Union No. 14-19-26, 2020-Ohio-3411, ¶ 41.  For these reasons, Randy's testimony about R.'s general character for truthfulness was permissible on redirect examination under Evid.R. 608(A).  *See State v. Skidmore*, 7th Dist. Mahoning No. 08 MA 165, 2010-Ohio-2846, ¶ 25.  *See also State v. Denson*, 1st Dist. Hamilton No. C-220208, 2023-Ohio-847, ¶ 23-26.

**{¶79}** *Seventh Instance*:  On cross-examination, Nancy was involved in the following exchange with the prosecutor:

[Prosecutor:]  And it [a written report] says, PGGM [Paternal Great-Grandmother] reported that she believes, quote, something happened, end quote.  Do you see that?

[Nancy:]  Yes, I do.

[Prosecutor:]  And so, the lady that wrote this report, she says that that is the exact language that you used, quote, something happened, end quote?

[Nancy:]  Well, I believe I said—I don't think I said that I believe that something happened, you know.

[Prosecutor:]  Uh-huh.

[Nancy:]  I said—I said, if something maybe happened—I think I said the same thing to Detective Flanagan.  I don't—you know.  You know what, at that time, I might have said this.  I'm not going to lie.  I might have said that because it was right in the beginning of everything and everything was—R[.] had said so many things and I felt so bad for her.  I didn't think that she would be lying about it, you know.

(Mar. 2 Tr. 127-128).  On appeal, Timothy challenges these statements as containing impermissible opinion testimony.

{¶80} However, on direct examination, defense counsel asked if Nancy "had any specific conversations with [R.] * * * regarding allegations she's made against Mr. Bruce[.]" (Mar. 2 Tr. 120).  In response, Nancy said, "I told Detective Flanagan, you know, I believe what she had told me and I am sorry but I swear I don't remember all the things that she told me." *Id.*  Given that Nancy had already made this statement during direct examination, we cannot conclude that defense counsel performed deficiently by failing to object to a discussion of her prior testimony on cross-examination.  *See also State v. Sierra*, 8th Dist. Cuyahoga Nos. 42827, 42829, and 42951, 1981 WL 5025, *9 (July 30, 1981); *State v. Amankwah*, 8th Dist. Cuyahoga No. 89937, 2008-Ohio-2191, ¶ 44.

**{¶81}** In summary, our analysis has concluded that four of these seven analyzed instances contained impermissible opinion testimony. As noted previously, this Court has held that where a child victim testifies at trial and is cross-examined, as in this case, such opinion testimony is generally considered to be harmless error. *See Hupp, supra*, at ¶ 18-19, 21 (finding harmless error where the father of the children-victims testified "that he believed their allegations * * *"). However, such opinion testimony is error nonetheless. While these four instances do not individually provide grounds for reversal, these multiple instances of harmless error are pertinent to a cumulative error analysis. *See State v. DeMarco*, 31 Ohio St.3d 191, 196-197, 509 N.E.2d 1256, 1261 (1997). For this reason, we will consider these four instances of improper opinion testimony as we determine whether Timothy has established prejudice in the final analysis.

### III. Deficient Performance Analysis: Hearsay Statements

**{¶82}** "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). The rules of evidence define a "statement" as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Evid.R. 801(A). "Hearsay is typically inadmissible unless the statement falls into a hearsay exception." *Berry*, *supra*, at ¶ 100, citing Evid.R. 802. "Under Evid.R. 103(A) and Crim.R. 52(A), we disregard as harmless the admission of improper hearsay evidence unless a substantial right of the party is

affected." *Brentlinger, supra*, at ¶ 48, quoting *State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ¶ 60.

**{¶83}** Further, "[a] defense counsel's failure to object is not ineffective assistance of counsel if the evidence is admissible." *State v. Brown*, 2020-Ohio-3614, 154 N.E.3d 1129, ¶ 79 (3d Dist.), quoting *State v. Jackson*, 8th Dist. Cuyahoga No. 86105, 2006-Ohio-174, ¶ 47. However, "where resolution of factual issues turns solely upon the credibility of witnesses, failure to object to hearsay testimony which bolsters the credibility of witnesses constitutes ineffective assistance of counsel." *State v. Nichols*, 116 Ohio App.3d 759, 765, 689 N.E.2d 98, 102 (10th Dist. 1996).

**{¶84}** On appeal, Timothy challenges eleven instances where he alleges inadmissible hearsay evidence was introduced at trial without objection. The first instance addresses a comment made by an expert who did not testify at trial. The next three instances address out-of-court statements made by Kimberly and Nancy to staff at Nationwide Hospital. These are followed by four instances that relate to R.'s disclosure of her allegations to Randy, her school principal, and a school nurse. The final three instances address the admission of three recorded police interviews of Kimberly and Brandee that were unredacted.

**{¶85}** *First Instance*: During cross-examination, the prosecutor engaged in the following exchange with Kimberly:

[Prosecutor:] Taking a look at State's Exhibit 29 [a video recording of an interview of Kimberly from September 25, 2018], you were talking about somebody named Miss Benton that used to counsel your son, Randy?

[Kimberly:] Yes, and had family counseling with her.

[Prosecutor:] And Miss Benton was some sort of a sex therapy counselor. Is that accurate?

[Kimberly:] Sex offender counselor.

[Prosecutor:] And you had talked to Miss Benton?

[Kimberly:] Yes.

[Prosecutor:] And that's what you were sharing with Detective Flanagan?

[Kimberly:] Yes.

[Prosecutor:] And you had shared with Detective Flanagan that that sex therapist shared with you that, quote, very rarely are kids lying about this that they make it up, end quote. Did you hear that statement from your own mouth?

[Kimberly:] I did.

(Mar. 2 Tr. 44-45).[15] This statement of Miss Benton as related through Kimberly at trial "was clearly hearsay and should not have been permitted." *State v. Porter*, 9th Dist. Summit No. 11091, 1983 WL 4222 (Sept. 14, 1983) (examining a case in which a witness repeated at trial what an expert had previously told him).

---

[15] Timothy also challenged this statement as improper opinion testimony and as hearsay. However, we need only address its admissibility in our analysis of hearsay statements.

-56-

{¶86} In the absence of significant physical evidence, the State's case ultimately relies on the jury's assessment of the allegations against Timothy. This challenged comment goes directly to the credibility of the allegations raised by a child. Further, this hearsay statement was purportedly made by a counselor who the jury would likely have perceived as an expert on the matter discussed. Accordingly, this testimony carries the potential for being unfairly prejudicial in addition to being inadmissible and should have been challenged by an objection.

{¶87} *Second Instance*: Alicia Daniels ("Daniels") is a forensic interviewer and mental health advocate at the Center for Family Safety and Healing at Nationwide Children's Hospital. As a part of her involvement in this case, Daniels coauthored a report in which she documented the interviews conducted in this case at Nationwide Hospital. At trial, the State had Daniels read various portions of the report into the record and comment on what was contained in various portions of the report. The portions of the report that she read contained statements that Nancy and Kimberly had made to the staff at Nationwide Hospital on the day of R.'s interview. On appeal, Timothy asserts that the out-of-court statements from Kimberly and Nancy were inadmissible hearsay.

{¶88} Some portions of this challenged evidence contain statements in which Nancy and Kimberly expressed their doubts regarding R.'s allegations and even suggested that R. may be raising these allegations because she wants to live with her father in Florida. The decision not to object to this class of statements may have

been a matter of trial strategy as this testimony was consistent with the Defense's

argument that R. had fabricated her allegations. However, the following portion of

this challenged testimony is of a different quality:

> [Prosecutor:] And the PGGM [Paternal Great Grandmother, Nancy], what did she respond to you because—would you have written down whatever they respond? I mean, that's why you make the summary. Correct?
>
> [Daniels:] Correct. It's a summary of how my conversation went with the family and what we discussed.
>
> [Prosecutor:] And so, the great-grandma [Nancy] * * * [w]hat did she respond?
>
> [Daniels:] She [Nancy] stated that she believes something happened but voiced concern that the patient could be exaggerating.
>
> [Prosecutor:] And then keep going.
>
> [Daniels:] And PGM [Paternal Grandmother, Kimberly] * * * reported feeling unsure of what to believe.
>
> [Prosecutor:] Now, in this particular situation, you used the word— you used quotes around something happened * * * didn't you? So, whose words would those have been?
>
> [Daniels:] That would have been paternal great-grandmother's [Nancy's] words.
>
> [Prosecutor:] And so, she's saying that she believes something happened but then she also adds?
>
> [Daniels:] That she's concerned it's exaggerated.

(Feb. 28 Tr. 123-124). Both Nancy and Kimberly would later be called to testify as

witnesses for the Defense.

-58-

{¶89} In these hearsay statements, Nancy and Kimberly conveyed their opinions as to whether they believed R.'s allegations. Since in-court declarations about whether a witness believes the allegations are not permissible, out-of-court hearsay declarations about whether a witness believes the allegations are not permissible. Nonetheless, we note that these statements described the doubts that R.'s family had about her allegations. For this reason, defense counsel may have refrained from raising an objection as a matter of trial strategy.

{¶90} *Third Instance*: At the conclusion of Daniels's testimony on direct examination, the following exchange occurred:

> [Prosecutor:] Now, in this particular scenario, you've interviewed about, I think it was 800 plus people. You've interacted with their caregivers. * * * [B]ut you said this particular interaction stuck out for you?
>
> [Daniels:] It did.
>
> [Prosecutor:] Why is that?
>
> [Daniels:] At the very end of the appointment when we were doing wrap up and I was giving the paperwork, so the Discharge Summary, um, I had a pretty direct conversation with the family about *reminding them that R[.] was the victim and not Mr. Bruce*.

(Emphasis added.) (Feb. 28 Tr. 129). In his brief, Timothy singles out the italicized portion of this exchange as a particular focus of his argument.

{¶91} However, Timothy lumps this statement in with his challenge to the hearsay statements in Daniels's report. This is understandable as this "direct conversation" came immediately after the interview in which Kimberly and Nancy

made the statements that are documented in Daniels's report. (Feb. 28 Tr. 129). But as Daniels's own statement, this comment stands apart from the hearsay statements from Nancy and Kimberly that were written in the report. We need not consider whether this statement was inadmissible hearsay as Daniels's comment that "R[.] was the victim and not Mr. Bruce" is independently problematic as it offers an opinion on the ultimate issue to be decided at trial. (Feb. 28 Tr. 129).

{¶92} When describing what "stuck out" to her, Daniels did not discuss the content of R.'s interview. (Feb. 28 Tr. 129). She did not point to any indicators of reliability that were present in R.'s allegations and that could assist the trier of fact in reaching a conclusion as to whether sexual abuse had occurred. *See State v. O.E.P.-T.*, 2023-Ohio-2035, --- N.E.3d ---, ¶ 179 (10th Dist.) (noting that a description of a child-victim's disclosure as "clear, coherent, and consistent" assisted the jury in evaluating the allegations instead of simply giving an opinion of the truthfulness of the allegations). *See Winterich*, *supra*, at ¶ 21.

{¶93} Rather, what "stuck out" to her was that, after the CAC interview, she believed R.'s allegations while R.'s family had doubts. *Id.* In the identified statement, she was telling the family members to believe that R. was the victim rather than Timothy.[16] At trial, this statement was not coupled with any information that could assist the jurors in ascertaining whether sexual assault occurred in this

---

[16] We are not examining whether this conversation was appropriate for Daniels to have with R.'s family at the CAC. We are only examining the appropriateness of eliciting this information at trial.

case. Further, the question posed to Daniels appears to have sought this answer. For these reasons, we place this statement alongside the other instances of impermissible opinion testimony that were reviewed previously.

{¶94} *Fourth Instance*: At trial, the State called Jami Casto ("Casto"), who is the Clinical Program Coordinator at the Center for Family Safety and Healing at Nationwide Children's Hospital, as a witness. During direct examination of Casto, the following exchange occurred:

[Prosecutor:] Then did you notice a reaction from grandmother?

[Casto:] She said that she had a hard time believing that.

[Prosecutor:] So, I want to make sure who the she is?

[Casto:] She being grandma.

[Prosecutor:] Grandma had a hard time—

[Casto:] Grandma and I talked to grandma and great-grandma together.

[Prosecutor:] Okay. And you heard grandma say?

[Casto:] That they had a hard time believing that.

[Prosecutor:] And they had a hard time believing what is the that?

[Casto:] That everything that she said about the sexual abuse. And then, prior to the interview, just so you know, prior to that they had talked about not thinking that it could have happened because of some concerns they had about his health problems.

(Feb. 28 Tr. 105). Casto's statements indicated that Nancy and Kimberly were skeptical of R.'s allegations from the outset. This testimony was not unfavorable to

-61-

the Defense. Thus, even if this testimony contained inadmissible hearsay, the unopposed introduction of favorable testimony cannot contribute to a finding of prejudice in the final analysis.

{¶95} *Fifth Instance*: The prosecution asked Randy about a conversation that he had with R. as follows:

[Prosecutor:] Did your daughter talk to you about pornography?

[Randy:] Yes.

[Prosecutor:] What—what did you learn and then determine from what your daughter said?

[Randy:] From what she had told me, I gathered that he had—he had shown her these videos, had essentially tried to educate her was the understanding that I got. But, again, she was lacking the words and I think the comfortability to tell me, you know, in fuller detail.

(Feb. 28 Tr. 44). In this testimony, Randy relayed what he came to understand from statements that R. made to him during her initial disclosure of the alleged abuse. On appeal, Timothy argues that these statements contained inadmissible hearsay and should have prompted an objection from defense counsel.

{¶96} However, defense counsel had previously objected on grounds of hearsay while Randy was testifying as to what R. had relayed to him during her initial disclosure of the allegations. The trial court had overruled this prior objection. The portion of Randy's testimony that Timothy challenges as inadmissible hearsay on appeal also came from R.'s initial disclosure to her father. Since the trial court had already allowed the statements from this conversation to be

admitted, defense counsel would have no reason to believe that the result of a subsequent objection would have been any different.

**{¶97}** "An attorney is not required to perform futile acts. It may well have been part of counsel's strategy not to badger the court with respect to rulings on which the court had made itself clear * * *." *State v. Mooney*, 9th Dist. Lorain No. 94CA005860, 1995 WL 453379, *3 (July 26, 1995). Further, the failure to do a futile act cannot be prejudicial. *State v. Powell*, 2019-Ohio-4345, 134 N.E.3d 1270, ¶ 69 (8th Dist.). Further, on cross-examination, defense counsel questioned Randy about the fact that R. never alleged she had been penetrated during her initial disclosure to him. (Feb. 28 Tr. 46). Thus, defense counsel may also have decided not to object as a matter of trial strategy in order to emphasize the fact that R. did not allege penetration until her later interview at Nationwide Hospital.

**{¶98}** *Sixth, Seventh, and Eighth Instances*: The next three challenged instances of alleged hearsay relate to statements that R. made in the process of disclosing her allegations at school. At trial, the school nurse, Courtney Thompson ("Thompson"), testified that R. came into the office at school; eventually asked for a piece of paper; wrote down the allegations ("R. Letter"); and then spoke about what she had written. After this interaction, Thompson wrote a letter ("Thompson Letter") that documented what had transpired in her office and what had been discussed in her conversation with R. Portions of the Thompson Letter were later

read at trial. The sixth instance of alleged hearsay is the admission of the Thompson Letter as this writing relates numerous statements made by R.

{¶99} After speaking with Thompson, R. went to speak with the school principal, Thomas Holdren ("Holdren"). (Mar. 1 Tr. 36, 38). The R. Letter was in his possession during this discussion. As he spoke with R., Holdren wrote down a series of notes ("Holdren's Notes") in the margin of the R. Letter. Holdren's Notes included a number of statements made by R. during their discussion. During his testimony at trial, Holdren read several of these notes and provided an explanation of their meaning when asked. The seventh instance of alleged hearsay is the admission of R.'s statements as relayed through Holdren's Notes. During Holdren's testimony, the State also published the R. Letter to the jury. The eighth instance of alleged hearsay is the admission of the R. Letter, containing R.'s written allegations.

{¶100} Elements of the Thompson Letter, Holdren's Notes, and the R. Letter provided defense counsel with various grounds to raise objections. However, for several reasons, we conclude that the decision on whether to object to this evidence falls within the realm of debatable trial tactics and strategy. At the outset, we note that the trial court had already overruled a hearsay objection on the grounds that R. would later testify. Thus, defense counsel could arguably have refrained from lodging an objection as the trial court's prior ruling on a hearsay objection indicated that R.'s statements likely would have been admitted. Further, given that R. was to testify, these statements were either going to be cumulative to R.'s trial testimony

or a source of inconsistent statements for the jury to consider if R.'s trial testimony was to vary from the statements she had made to Thompson and Holdren. Accordingly, we cannot conclude that these are instances of deficient performance.

{¶101} *Ninth, Tenth, and Eleventh Instances*: While cross-examining Kimberly, the State played several small portions of recorded interviews that she had sat for on September 28, 2018 and November 30, 2018 with Detective Flanagan. Subsequently, while cross-examining Brandee, the State played a small portion of a recorded interview between her and Detective Flanagan that occurred on September 20, 2018. At the conclusion of Timothy's trial, unredacted copies of these entire interviews were then admitted into evidence as Exhibits 29, 30, and 31. Prior to admission, the trial court asked defense counsel if he had any objection to these three exhibits. Defense counsel expressly stated that there was no objection.

{¶102} On appeal, Timothy argues that defense counsel should have objected to the admission of these unredacted interview recordings into evidence as exhibits on hearsay grounds. In these interviews, Detective Flanagan gave several protracted evaluations of the content and credibility of R.'s allegations. Kimberly and Brandee also recounted a number of Timothy's other acts that were unrelated to the charges against him. Further, these interviews also contained a number of descriptions of the other acts evidence that was admitted at trial, challenged on appeal, and found to be unfairly prejudicial in our prior analysis. The renderings of

these prior acts were far more unfairly prejudicial in these recorded interviews than the renderings of these same incidents that were given at trial.

**{¶103}** We have already concluded that the unfairly prejudicial testimony given at trial regarding Timothy's prior acts should not have been introduced unchallenged. For the same reasons, we conclude that these unredacted interviews, which contain more prejudicial versions of the same information in addition to other prejudicial opinion evidence and other prior bad acts evidence, also should not have been admitted into evidence as exhibits unchallenged. *See also State v. Fuchs*, 2d Dist. Montgomery No. 27873, 2019-Ohio-4294, ¶ 22.

IV. Deficient Performance Analysis: Closing Arguments

**{¶104}** In examining claims of prosecutorial misconduct, "the standard of review 'is [1] whether remarks are improper and, if so, [2] whether they prejudicially affected substantial rights of the accused.'" *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 27, quoting *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990).

> "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 220, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). "A prosecutor is entitled * * * to 'wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn therefrom.'" [*State v.*] *McKelton*, [148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508,] * * * ¶ 274[, quoting] *State v. Stephens*, 24 Ohio St.2d 76, 82, 263 N.E.2d 773 (1970). However, '[i]t is improper for an attorney to express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused.' [*State v.*] *Smith*[, 14 Ohio St.3d 13,]

14, 470 N.E.2d 883 [(1984)] citing *State v. Thayer*, 124 Ohio St. 1, 176 N.E. 656 (1931). 'A prosecutor may state his opinion if it is based on the evidence presented at trial.' *State v. Klein*, 3d Dist. Union No. 14-12-09, 2013-Ohio-2387, * * * ¶ 60, quoting *State v. Watson*, 61 Ohio St.3d 1, 10, 572 N.E.2d 97 (1991) *abrogated on other grounds by State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997).

*State v. Thompson*, 3d Dist. Henry 2017-Ohio-792, 85 N.E.3d 1108, ¶ 21. "[N]ot every intemperate remark by counsel can be a basis for reversal." *State v. Liles*, 3d Dist. Allen No. 1-14-61, 2015-Ohio-3093, ¶ 31, quoting *State v. Porter*, 4th Dist. Meigs No. 10CA15, 2012-Ohio-1526, ¶ 20. "Misconduct of a prosecutor at trial will not be considered grounds for reversal unless the conduct deprives the defendant of a fair trial." *State v. Johnson*, 2014-Ohio-4750, 22 N.E.3d 249, ¶ 88 (3d Dist.).

{¶105} In his brief, Timothy identifies the following remark that was made during closing arguments as the basis of his prosecutorial misconduct claim:

> I want you to pay particular close attention. If you remember Mr. Bruce, when R[.] was testifying, didn't make near as many sounds or noises or grunts or words. He knows what he's doing. Trying to look at R[.]. Trying to keep in contact with. His mumbling's greatly decreased, you see, because he's got to make note of everything she says.

(Mar. 2 Tr. 151). Timothy argues that the prosecutor, by referencing his demeanor and appearance at trial, violated his Fifth Amendment right against self-incrimination by improperly drawing attention to his decision not to testify.

{¶106} However, the Ohio Supreme Court has held that "[a] defendant's face and body are physical evidence." *State v. Brown*, 38 Ohio St.3d 305, 317, 528

N.E.2d 523, 538 (1988). For this reason, "[a] prosecutor may comment on the defendant's physical appearance, demeanor and body language during trial." *State v. Williams*, 1st Dist. Hamilton No. C-180291, 2020-Ohio-1228, ¶ 37, citing *Brown* at 317; *State v. Green*, 90 Ohio St.3d 352, 373, 2000-Ohio-182, 738 N.E.2d 1208, 1232 (2000); *State v. Bey*, 85 Ohio St.3d 487, 496-497, 1997-Ohio-283, 709 N.E.2d 484 (1999). *See also State v. Hill*, 75 Ohio St.3d 195, 203, 661 N.E.2d 1068, 1078 (1996).

{¶107} Further, prosecutorial comments about the demeanor of the accused at trial are not, as a general matter, properly understood as implicating a defendant's Fifth Amendment right not to testify. *State v. Weaver*, 178 Ohio App.3d 504, 2008-Ohio-5022, 898 N.E.2d 1023, ¶ 143 (6th Dist.); *State v. Ladson*, 8th Dist. Cuyahoga No. 105914, 2018-Ohio-1299, ¶ 36. *See also State v. A.W.M.*, 10th Dist. Franklin No. 18AP-523, 2020-Ohio-4707, ¶ 61-62. *But see State v. McDonald*, 6th Dist. Lucas No. L-08-1032, 2010-Ohio-574, ¶ 27.

{¶108} Having examined the content of the challenged statement, we cannot conclude that the prosecutor intended this remark to be a comment on Timothy's decision not to testify or that the jurors would have understood this remark to be a comment on Timothy's decision not to testify. *State v. Shivers*, 8th Dist. Cuyahoga No. 106601, 2018-Ohio-5174, ¶ 62, quoting *State v. Webb*, 70 Ohio St.3d 325, 328, 1994-Ohio-425, 638 N.E.2d 1023 (1994). Thus, there is no indication that the State impermissibly commented on Timothy's decision not to testify as he alleged in his

brief. (*See* Appellant's Brief, 23). *See also State v. Erker*, 2019-Ohio-3185, 141 N.E.3d 543, ¶ 121 (8th Dist.).

**{¶109}** Timothy also argues that this comment contained irrelevant evidence regarding his demeanor during trial. Again, the Ohio Supreme Court has held that a defendant's demeanor and behavior during trial constitute evidence on which a prosecutor may comment. *Brown, supra,* at 317; *Green*, *supra*, at 373; *Hill, supra*, at 203. While the content of this challenged comment is somewhat inscrutable, the prosecution appears to be addressing several statements that defense counsel made in opening arguments about how Timothy's traumatic brain injury affects his responses to his surroundings. *See Williams, supra*, at ¶ 37-38. Defense counsel had previously stated the following:

> I've talked to you a little bit during jury voir dire about my client, Tim Bruce, and his issues with the traumatic brain injury. I'm not going to go through all that again but just want to point out to you one more time it causes him sometimes, when he gets upset about things, to act out. Not against R[.] but while we're in trial here. He's having some difficulty while we were sitting listening to opening statements because it so offended him the things that [the prosecutor] * * * was saying. All these things that have been made up about him. And as a result, he's unable to control himself.

(Feb. 28 Tr. 27). Thus, the statements by the prosecution appear to be a response to these previous comments from the Defense. Given this context, we cannot conclude that the prosecutor's remarks during closing arguments were prejudicial or harmful to the Defense even if we were to assume that the comments were improper. *See Brown, supra*, at 317.

Prejudice Analysis

**{¶110}** Our analysis of the assigned errors concluded that this trial contained multiple errors that were, in several instances, significant. To establish prejudice, Timothy essentially argues that the cumulative effect of the multiple errors he identifies on appeal was to deny him a fair trial and to undermine confidence in the result of these proceedings. He argues that, in the absence of these errors, a reasonable probability exists that the jurors may not have returned verdicts of guilty on the charges against him.

**{¶111}** "The Ohio Supreme Court previously recognized that the doctrine of cumulative error may be applied to a claim of ineffective assistance of counsel."

*State v. Hopings*, 6th Dist. Lucas No. L-20-1075, 2022-Ohio-1532, ¶ 44.

> The cumulative-error doctrine provides that 'a conviction will be
> reversed when the cumulative effect of errors in a trial deprives a
> defendant of a fair trial even though each of the numerous instances
> of trial-court error does not individually constitute cause for reversal.'

*State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 169, quoting

*State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223.

> A claim of cumulative error based on the ineffective assistance of
> counsel would require a determination that while no single act by trial
> counsel met the standard set forth in *Strickland*, * * * [*supra* at 687-
> 688], the cumulative effect of counsel's conduct satisfied the
> *Strickland* standard.

*State v. Howard*, 2020-Ohio-3819, 156 N.E.3d 433, ¶ 85 (2d Dist.).

{¶112} To establish prejudice, "the defendant must demonstrate * * * that there exists a reasonable probability that, but for counsel's error[s], the result of the proceeding would have been different." *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, 146 N.E.3d 560, ¶ 14. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, quoting *Strickland, supra*, at 694. This requires more than a conclusion that "the defendant was simply harmed by counsel's alleged deficient performance." *Id*. at ¶ 15. *See also State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, fn. 1 (1989).

{¶113} Beyond making a general assertion that the identified errors were prejudicial, Timothy raises several arguments to establish that the challenged errors were particularly damaging to his defense under the facts of this case. He begins by pointing to the testimony from Detective Flanagan and Hornor regarding the absence of physical evidence to corroborate the allegations of rape against him. On cross-examination, Detective Flanagan testified as follows:

> [Defense Counsel:] Now, isn't it true that, as testified to earlier, there's no physical evidence that any of these things actually occurred?
>
> [Detective Flanagan:] That's correct.
>
> [Defense Counsel:] So, your investigation and then your ensuing speculation as to what occurred are based on—on the actual verbal allegations by R[.]?
>
> [Detective Flanagan:] That's accurate.

(Mar. 1 Tr. 180). The nurse who had examined R. testified as follows:

[Defense Counsel:] * * * And the physical exam, itself, from your examination of R[.], there is no indication in fact that she was penetrated. Correct?

[Hornor:] Her exam was normal. Correct.

[Defense Counsel:] Okay. And there's no, from a physical examination viewpoint, there's no indication, no evidence that in fact she was even sexually molested. Correct?

[Horner:] Correct.

(Mar. 1 Tr. 23).[17] In the absence of physical evidence, Timothy argues that the State's case depended on the credibility of the allegations against him, increasing the harmful impact of the errors that he challenges on appeal. Thus, he asserts that the improper opinion testimony unfairly bolstered the State's case against him while the improper evidence of other potentially illegal activities and bad acts unfairly undermined his defense.

**{¶114}** We note that the jury instructions given by the trial court directed the jury to consider the other acts evidence only for the delineated, permissible purposes. The jury instructions also admonished the jurors that they were "the sole judges of the facts" and "the credibility of the witnesses." (Mar. 2 Tr. 175, 176). However, while "[t]he giving of a curative instruction will often obviate the necessity of a mistrial * * *, there are some instances in which the prejudice is so

---

[17] We note that Hornor testified at trial that R. "gave extensive history of sexual abuse" and that her (Hornor's) "diagnosis of sexual abuse was made based upon her [R.'s] * * * extensive history * * *." (Mar. 1 Tr. 23). *See State v. Schewirey*, 7th Dist. Mahoning No. 05 MA 155, 2006-Ohio-7054, ¶ 53.

great that it is impossible 'to unring the bell.'" *Tumblin v. State*, 29 So.3d 1093, 1102 (Fla. 2010), quoting *Graham v. State*, 479 So.2d 824, 825-26 (Fla. App. 1985). It is our opinion that this case presents one such instance.

{¶115} Having considered each of these alleged instances of deficient performance, we conclude that the result of defense counsel's numerous instances of inaction was the introduction of inadmissible and highly prejudicial testimony. The cumulative effect of these errors was to deny Timothy his right to a fair trial. For this reason, we conclude that Timothy has carried the burden of establishing that he was denied his right to the effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution. His sole assignment of error is sustained. Accordingly, we vacate all of Timothy's convictions in this case and remand this cause of action for a new trial. *See State v. Barr*, 158 Ohio App.3d 86, 2004-Ohio-3900, 814 N.E.2d 79, ¶ 3 (7th Dist.).

*Conclusion*

{¶116} Having found error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Union County Court of Common Pleas is reversed. We remand this cause of action for further proceedings consistent with this opinion.

*Judgment Reversed*
*And Cause Remanded*

**MILLER, P.J., concurs.**

**ZIMMERMAN, J., concurring separately.**

{¶117} I write separately in support of our decision to reverse the conviction of the Defendant. Plain and simple, the State went too far in its use of highly prejudicial and irrelevant evidence without objection by the Defense. One can only imagine how the jury considered such evidence in its deliberation on charges that had no connection.

**/hls**